Kevin McMAHON and Anthony Conwall, on behalf of themselves and all others similarly situated, et al., Plaintiffs,

v.

Antonia NOVELLO, as Commissioner of the New York State Department of Social Services, et al., Defendants.

No. 91–CV–621C.

United States District Court, W.D. New York.

Dec. 20, 2001.

Heritage Centers, Buffalo, New York (Judith K. Munger, of Counsel), for Plaintiffs.

Eliot Spitzer, Attorney General of the State of New York (Kim S. Murphy, Assistant Attorney General, of Counsel), Buffalo, New York, New York State Department of Health, Division of Legal Affairs (Daniel J. Tarantino, Senior Attorney, of Counsel), Albany, New York, for State Defendants.

Kathleen M. Mehltretter, United States Attorney (Jane B. Wolfe, Assistant United States Attorney, of Counsel), Buffalo, New York, Social Security Administration, Region II (Stephen P. Conte, Assistant Re-

gional Counsel, of Counsel), New York, New York, for Federal Defendants.

## INTRODUCTION

CURTIN, District Judge.

This case was originally filed as a class action against the Commissioners of the New York State Department of Social Services (N.Y.SDSS) and the Erie County Department of Social Services (ECDSS) on September 23, 1991. Item 1. The plaintiff class consisted of members who were typically mentally retarded and living with older parents who were eligible for but lost Medicaid coverage. By way of their complaint, plaintiffs sought to remedy "defendants' policies and practices which have resulted in the failure to implement 42 USC § 1383c(c),[1] which provides for continued Medicaid benefits for disabled adults who have had Supplemental Security Income (SSI)[2] benefits discontinued solely because of eligibility for or an increase in Social Security Child's Insurance Benefits, also known as Disabled Adult Child's (DAC) benefits." Item 1, ¶ 1. Only plaintiffs' motion for attorneys' fees, Item 68, remains to be decided.

The complaint explained the plight of the class members: "When one of the parents, usually the father, dies, the adult son or daughter qualifies for DAC benefits on the earnings record of the father. Since the DAC benefits are more than the SSI check he or she had received until the father's death, the SSI benefits are terminated." *Id.*, ¶ 2. Once a person's SSI benefits are terminated, that person also often loses Medicaid[3] benefits, even though they are entitled to continued Medicaid eligibility under 42 U.S.C. § 1383c(c)[4]. Plaintiffs sought injunctive relief guaranteeing their statutory and constitutional[5] rights and requiring full implementation of 42 U.S.C. § 1383c(c); a declaratory judgment that these policies violate, *inter alia*, the Social Security Act; and reinstating the Medicaid benefits of members of the plaintiff class and reimbursement of medical expenses

---

1. This provision, entitled "Loss of benefits upon entitlement to child's insurance benefits based on disability" provides:

   If any individual who has attained the age of 18 and is receiving benefits under this subchapter on the basis of blindness or a disability which began before he or she attained the age of 22–
   (1) becomes entitled, on or after the effective date of this subsection, to child's insurance benefits ... or to an increase in the amount of the child's insurance benefits which are so payable, and
   (2) ceases to be eligible for benefits under this subchapter because of such child's insurance benefits or because of the increase in such child's insurance benefits,
   such individual shall be treated for purposes of subchapter XIX of this chapter as receiving benefits under this subchapter so long as he or she would be eligible for benefits under this subchapter in the absence of such child's insurance benefits or such increase.
   42 U.S.C. § 1383c(c) (2001).

2. Supplemental Security Income (SSI) is a benefit program established by Congress for the aged, blind, and disabled. 42 U.S.C. §§ 1381, *et seq.* To qualify for SSI benefits as disabled, a person's disability must meet SSI's criteria (42 U.S.C. § 1382c), and the person must have income and resources which fall within limits set by the SSI program.

3. The Medical Assistance ("Medicaid") Program is a joint federal-state program which provides health benefits to individuals. 42 U.S.C. §§ 1396, *et seq.*

4. In New York State, a person who is eligible for any amount of SSI benefits is categorically eligible for Medicaid. *See* New York Social Services Law § 366(1)(a)(2); 42 U.S.C. § 1396a(10)(A)(i).

5. Plaintiffs have asserted claims under the due process clause of the Fifth and Fourteenth Amendments to the United States Constitution.

they incurred from the date their Medicaid benefits were improperly terminated.

## BACKGROUND

When this complaint was filed, plaintiffs held the State Department of Social Services and the Erie County Department of Social Services responsible for loss of their Medicaid benefits, pointing to NYSDSS as failing to provide timely and accurate information to ECDSS to identify individuals who were potentially eligible for Medicaid pursuant to 42 U.S.C. § 1383c(c). All six of plaintiffs' causes of action against these two defendants were brought under 42 U.S.C. § 1983.

Within two months of filing the complaint, plaintiffs moved to amend, adding two claims for relief against the new defendant, the Secretary of Health and Human Services (HHS). Item 7. A Stipulation and Order was subsequently entered regarding class certification. Item 13. During 1993 and 1994, plaintiffs and defendants undertook settlement negotiations, which resulted in a Stipulation and Order of Partial Settlement ("Partial Settlement") on January 31, 1995. Item 15. The Partial Settlement provided that the HHS Secretary would issue State Medic-

aid Manual instructions for the implementation of 42 U.S.C. § 1383c(c). The instructions would address the obligations of the State Medicaid Agencies to prospectively certify as Medicaid eligible those persons meeting the criteria of 42 U.S.C. § 1383c(c). Item 15, p. 3. In order to implement the Partial Settlement, the Social Security Agency modified its computer systems[6] to insure that the State Data Exchange (SDX),[7] sent to the NYSDSS, contained a code in the Medicaid eligibility field that identified potential § 1383c(c) candidates whose SSI benefits had been terminated due to the amount of their DAC benefits. Item 15, ¶ 29. The NYSDSS was also required to implement the Partial Settlement by, *inter alia*, issuing various Administrative Directives and Regulations explaining criteria for Medicaid eligibility under 42 U.S.C. § 1383c(c), and providing for readjudication by potential class members regarding their eligibility for Medicaid. Item 15, ¶¶ 12–21.

In addition, the Partial Settlement identified a remaining problem confronting a subset of the plaintiff class: those "dually entitled" Social Security beneficiaries "who receive DAC benefits in addition to disability insurance benefits based on their own

---

**6.** "Entitlement to continued Medicaid eligibility, for solely DAC entitled beneficiaries, despite the termination of their SSI benefits, is automatically and permanently indicated by a special code in the computerized information transferred from the Social Security Administration to the State Department of Health via the State Data Exchange system (the 'SDX'). These transmittals are made on a daily or almost daily basis." Item 48, p. 1.

**7.** SSI eligibility information is transmitted to the states from the federal government by way of the State Data Exchange (SDX), which is part of the SSI (Title XVI) computer system. The SDX contains some, but not all, of an individual's Supplemental Security Record (SSR), which reflects the total amount of a person's Title II benefits. (Title II relates to

Social Security Disability Insurance.) However, the specific breakdown of a person's Title II benefits, needed for the State to determine members of the plaintiff class, is indicated in the Master Beneficiary Record (MBR), which is part of the Title II computer system. This litigation has revealed that the information transmitted through the MBR–SSR interface did not provide necessary information to allow the State to determine the dually eligible DACs. This is an example of one of the technical problems besetting this litigation. *See, e.g.,* July 17, 1996 letter from Kathleen Mahoney, SSA Assistant Regional Counsel, to Donald Simet, Assistant U.S. Attorney, attached to July 18, 1996 letter from Simet to the Court (no item number) for background information on the various computer systems.

earnings records, [who] may be eligible for Medicaid continuation pursuant to the provisions of 42 U.S.C. § 1383c(c)." Item 15, ¶ 28.[8] At the time of the Partial Settlement, the HHS Secretary could not state that their computer systems produced an identification code for these dually entitled Social Security beneficiaries. As a result, the Secretary was investigating whether their computer systems could be modified to indicate such a code. *Id.*, ¶ 30. Plaintiffs reserved the right to seek future amendment of the Settlement Order with respect to those dually entitled individuals who had not been identified as potential class members. *Id.*, ¶ 31.

Following entry of the Partial Settlement, plaintiffs made their first motion for attorneys' fees on February 24, 1995, reflecting the hours their attorneys had expended on the case from 1991 through the first two months of 1995. Item 17. In an order dated September 3, 1996, the court withheld passing upon the application for attorneys' fees until the conclusion of the action. Item 31.

In March 1995, the Social Security Administration (SSA) became an independent agency, and the Commissioner became a defendant in this case, joining the Commissioner of HHS (collectively, the "federal defendants", or "the government"). Item 71, p. 2, n.1.

The court hosted a series of status conferences and meetings among the parties during 1995, 1996, 1997, 1998, 1999, and 2000. Often the topic of the meetings and correspondence concerned the preparation of the computer program that would identify the dually eligible class members. *See* Items 25 and 26. Because of the difficulties in creating such a program, the court ordered that it would hold a hearing to determine why the State and federal authorities could not resolve the matter more promptly. Item 27. Throughout 1996 and 1997, the defendants' technical and computer staffs continued to work on the computer programs. The SVES [9] system was to go into effect in June 1998, and SSA was to provide training manuals. Item 41. The defendants continued to exchange information in order to refine the program, Item 46, with input from plaintiffs. Item 48. The State was unable to access the modified SVES system, Item 49, and proposed a change to the SDX system. Item 50. The SSA agreed to modify the SDX system, Items 52, 53, and this endeavor ultimately proved successful. The process culminated on December 18, 2000, with a Supplemental Stipulation and Order to Amend the Court's Partial Settlement ("Supplemental Stipulation"). Item 66.

The Supplemental Stipulation resolved the remaining issue of identifying the "dually entitled" Social Security beneficiaries. The Social Security Administration was finally able to modify its computer system and agreed to forward to the New York State Department of Health [10]

---

8. Put another way, "dual eligibles" are "those DAC recipients who receive a Social Security Disability payment based upon their own work record as well as the DAC benefits which they receive on their parents' work records." Letter from Judith Munger to the Court, dated November 25, 1997, p. 2 (no item number).

9. This is the State Verification Exchange System, one of the Social Security Administration's computerized programs. It contains

information similar to that found on the SDX system. Item 71, p. 11.

10. Daniel Tarantino, Senior Attorney with the New York State Department of Health, submitted documents on behalf of defendant Novello, Commissioner of the NYSDSS. Mr. Tarantino indicated that in the course of his duties with NYSDOH, he was responsible for monitoring this action. Item 70, ¶ 1. He advises NYSDOH staff "with respect to the laws and regulations regarding eligibility under the

(N.Y.SDOH) necessary data in order that NYSDOH might identify prospective dual eligibles under 42 U.S.C. § 1383c(c). In addition, the SSA agreed to provide NYS-DOH with a list of 660 dually entitled beneficiaries who became ineligible for SSI between July 1, 1987 and March 17, 1994, as well as to identify the dually entitled DAC beneficiaries who became ineligible for SSI between March 17, 1994 and March 31, 1999. Item 66, p. 3. Pursuant to the Supplemental Stipulation, the NYS-DOH had corresponding obligations (*i.e.*, notification of the sub-class, providing for adjudication or readjudication of Medicare benefits pursuant to 42 U.S.C. § 1383c(c), etc.). At the same time that the parties filed the Supplemental Stipulation, they also filed a Stipulated Protective Order which provided that the lists of individuals (including names, addresses and social security numbers) that the SSA would be providing the NYSDOH could only be used for the purpose of determining eligibility for Medicaid and could not be otherwise disclosed. Item 65.

On January 5, 2001, plaintiffs once again moved for attorneys' fees. Item 68. In response, the State defendant submitted additional affidavits and letters, Items 70, 79, 81, 86. The federal defendants opposed plaintiffs' petition for attorneys' fees. In the alternative, they argued that no more than 25 percent of the total hours charged by plaintiffs' attorneys be assessed against the government. Items 71, 75, 78, 85.

## DISCUSSION

### I. The Standard: Motion for Attorneys' Fees

Plaintiffs' attorneys are requesting attorneys' fees against the State and federal defendants pursuant to two different statutory schemes. They claim attorneys' fees against the federal defendants pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, and against the State and County defendants pursuant to 42 U.S.C. § 1988.

■ The purpose of the EAJA "is to ease the economic imbalance between an individual claimant and the United States in order to reduce the likelihood that challenges to unreasonable bureaucratic actions will be deterred by the high cost of litigating against the Government." *Marschok v. United States*, 150 F.Supp.2d 522, 525 (E.D.N.Y.2001) (citations omitted). To this end, the EAJA provides that a court shall award fees and expenses to the prevailing party in an action brought by or against the Government "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d).

With regard to attorneys' fees under 42 U.S.C. § 1988, the standard is less stringent than that required by the EAJA. Fees under § 1988 are available for successful plaintiffs in a 42 U.S.C. § 1983 lawsuit (the statute under which relief for plaintiffs' six causes of action was sought). Section 1988 provides that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorneys' fee as part of the costs." 42 U.S.C. § 1988(b).

■ The allocation of fee liability among defendants "is a matter committed to the district court's discretion and will not be disturbed unless the determination evidences an abuse of discretion." *Koster v. Perales*, 903 F.2d 131, 139 (2d Cir.1990). District courts have "appropriately considered a variety of factors in allocating fee

New York State Medical Assistance (Medic-         aid) program." Item 79, ¶ 1.

liability including the relative culpability of the parties ... and the proportion of time spent litigating against each defendant." *Id.* (citations omitted).

## II. Plaintiffs' Arguments

In their original motion for attorneys' fees filed in February 1995, Item 17, plaintiffs' three attorneys, James R. Sheldon, Jr., Edwin J. Lopez–Soto, and Judith K. Munger, attached itemized affidavits indicating that they had expended a total of 591.9 hours in prosecuting this action. They requested total fees in the amount of $88,785: 277.4 hours for James Sheldon at $150.00 per hour; 166.2 hours for Edwin Lopez–Soto at $150.00 per hour; and 148.3 hours for Judith Munger at $150.00 per hour. *Id.*, pp. 1, 2. Plaintiffs' attorneys anticipated at the time that they would also be required to expend time monitoring and enforcing the Partial Stipulation, and that they may also have to make an additional motion for attorneys' fees in connection with resolving the issues concerning dually entitled beneficiaries. *Id.*

In his affidavit, Mr. Sheldon noted both that the $150.00 per hour fee and the time expended was reasonable under 42 U.S.C. § 1988, *id.*, Ex. A, pp. 9–13. Mr. Sheldon asserted that, under 42 U.S.C. § 1988, there were no special circumstances that would make an award of attorneys' fees unjust. *Id.*, ¶ 15. He also asserted that plaintiffs met all the requirements for attorneys' fees under the EAJA: the plaintiffs had received the relief they requested and had prevailed in a civil action against a federal official in her official capacity, 28 U.S.C. §§ 2412(d)(1)(A) and (d)(2)(C); and the individual net worth of the named plaintiffs and class members was less than $2,000, 28 U.S.C. § 2412(d)(2)(B). Item 17, Ex. A, ¶ 17.

He also averred that the position of the United States was not "substantially justified." Although the federal government claimed in its answer that the plaintiffs had not stated a claim upon which relief could be granted, Mr. Sheldon pointed out that it had nevertheless rectified problems in the computer transmittals by reprogramming the system and issuing new instructions regarding § 1383c(c) in the State Medicaid Manual. All of these initiatives implemented by the federal defendants demonstrated the lack of justification for HHS's position. *Id.*, ¶¶ 18, 19.

Mr. Sheldon suggested that the court consider allocating responsibility for the attorneys' fees among the State, federal, and County defendants as follows: 70 percent to NYSDSS, 25 percent to HHS, and 5 percent to ECDSS. Mr. Sheldon observed, "I believe this apportionment of responsibility accurately reflects the relative time expended by plaintiffs' counsel on the various issues involved in this case, to the extent that those issues can be isolated with respect to each of the defendants." *Id.*, ¶ 36. He interpreted the EAJA, 28 U.S.C. § 2412(d)(2)(A), as allowing a maximum billing rate of $119.25 per hour,[11] representing the $75.00 per hour authorized rate increased by the Consumer Price Index (CPI) for "All Items" (CPI–U). *See Kerin v. United States Postal Service*, 218 F.3d 185, 194 (2d Cir.2000). Since the hourly rate requested by plaintiffs' counsel, $150.00, exceeded the EAJA statutory cap of $119.25, he suggested that if the court apportioned 25 percent of the fee obligation against HHS, the federal government would pay only 25 percent of

---

11. He arrived at this figure by comparing the October 1981 Cost of Living Index with the January 1995 Index, which increased 59 percent. He then took the EAJA maximum rate of $75 per hour, increased that figure by 59 percent pursuant to the Consumer Price Index (CPI–U), which equals $119.25 per hour. Item 17, Ex. A, ¶ 37.

the $150.00 hourly rate, or $37.50 an hour, which would be half of the $75.00 statutory cap. He also posited another alternative for the court to consider. The federal defendants would pay for 25 percent of the total hours expended (.25 × 591.9 hours) at $119.25 an hour. None of the defendants responded to this motion at the time, and no fees were awarded. In July 1996, Mr. Sheldon no longer represented plaintiffs. Item 30.

On January 5, 2001, following entry of the Supplemental Stipulation, plaintiffs' counsel again moved for attorneys' fees in the amount of $126,637.50, reflecting 844.25 hours of work. Item 68. Mr. Sheldon sought compensation for 343.75 hours at $150.00 per hour, Mr. Lopez–Soto sought compensation for 244.80 hours at $150.00 per hour, and Ms. Munger sought compensation for 255.70 hours at $150.00 per hour. *Id.* They referred to their first motion for attorneys' fees, Item 17, with its attached affidavits of Sheldon (Ex. A), Lopez–Soto (Ex. B) and Munger (Ex. C), and attached updated time records reflecting the additional time each attorney had spent on this case since February 1995.

In a letter-submission to the court, the plaintiffs' attorneys revised the allocation of fees between defendants that it had proffered in 1995. While underscoring that allocation is a matter of the court's discretion, plaintiffs' attorneys agreed with the New York State defendant that "the fees should be borne equally by the state and federal defendants," and "in the interests of fairness the fees should be shared equally." Item 74, p. 1. Plaintiffs' attorneys posited two reasons for this change of position: (1) The suit involves a federal statute and program, Medicaid, funded and regulated by both federal and State governments; both defendants failed to take the steps required to implement 42 U.S.C. § 1383c(c); and resolving the case re-quired the collaboration of both federal and State technical staffs. Thus, State and federal defendants contributed both to the breakdown in implementation of the statute and to the development of the remedy; and (2) through the course of litigation, the delays were more often caused by the failure of the federal defendant to provide critical information. *Id.,* pp. 1, 2.

Plaintiffs' attorneys offered to forego fees for the work they performed during the year 2001 (approximately 20 hours) if the case could be resolved in the "imminent future." Item 84, p. 1.

### III. Federal Defendants' Arguments

The federal defendants (the Commissioners of the Department of Health and Human Services and the Social Security Administration) have raised the strongest objections to plaintiffs' motion for attorneys' fees. They first assert that no fees can be awarded against the government because its position was "substantially justified" within the meaning of the EAJA, 28 U.S.C. § 2412(d)(1)(A). "[S]ubstantially justified," according to *Pierce v. Underwood,* 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), does not mean "justified to a high degree" but rather is satisfied if there is a "genuine dispute" or "if reasonable people could differ as to [the appropriateness of the contested action]." *Id.* at 565, 108 S.Ct. 2541.

Pursuant to this definition, the federal defendants contend that the lawsuit "basically involved erroneous determinations made by the New York State Department of Health and Erie County," given that the State and County failed to continue Medicaid for people who had lost SSI eligibility due to their receipt of additional Title II benefits. Item 71, pp. 5–6. The government asserts that the State and County are "the only entities authorized by law to make Medicaid continuation determina-

tions. The government has no authority to make such determinations" and therefore cannot be considered a "wrongdoer" here. *Id.,* p. 6. Moreover, it was never the government's responsibility to identify individuals who should have had their Medicaid continued. *Id.,* p. 9. In fact, argues the government, it shared its information with the State and was part of the solution, not part of the problem. After being named as a defendant, it "acted reasonably in all aspects of [the] litigation." *Id.,* p. 7. The government points out how it modified its computer system at enormous expense and developed a program to identify all class members from 1987 to March 1995. *Id.,* p. 11. As part of the modification process, it modified the State Verification and Exchange System (SVES) with the understanding those changes would satisfy the State's needs, only to find that the State "did not implement the necessary systems changes to gain the capability to use the SVES system . . . ." *Id.,* p. 12.

In the alternative, the government argues that should the court find its position was neither reasonable nor substantially justified and that an award of attorneys' fees was appropriate, the government's apportioned share of the fees should be no more than 25 percent, as suggested by Mr. Sheldon in the first motion for fees. Item 17.

The government asserts that it should only "reimburse plaintiffs for the time their attorneys spent handling aspects of this litigation that involved the Government." Item 71, p. 15, citing *Jones v. Espy,* 10 F.3d 690 (9th Cir.1993). The proper methodology would be to use the

$75.00 EAJA rate cap increased by the Corresponding Price Index for each year in which legal work was performed.

In later submissions, the government reasserted and expanded upon its initial objections. It pointed to New York State's failures to provide SSA with the "necessary identifying information concerning those individuals about whom the State needed information" as well as the State's failure to implement the SVES system which contained that needed information. Item 75, p. 4. It also blamed New York State for not capturing certain important information (the "D code" [12]) which the government sent the State and the State did not retain. Item 78, pp. 1–3; Item 85, p. 4.

In its final submission, the government claimed that the plaintiffs were not "prevailing parties" under *Buckhannon Board and Care Home Inc. v. West Virginia Dept. of Health and Human Resources,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). Item 85, p. 3.

## IV. State Defendant's Arguments

Defendant Antonia C. Novello, as Commissioner of the New York State Department of Social Services, recounted through her attorneys how the last six years of litigation in this case (1995–2001) had been spent developing a process for identifying the dually entitled SSI beneficiaries who receive DAC benefits in addition to disability insurance benefits based upon their own earnings and who would be eligible for a continuation of Medicaid under 42 U.S.C. § 1383c(c). The State's only access

---

12. The "D Code" was first raised as an issue in 1998. See Item 55. The MBR system (see footnote 7, *supra*) alerts SSR about a person's entitlement to or increase in DAC benefits in a month when that person's excess income causes Title XVI ineligibility. When that happens, SSR will reflect a Medicaid Eligibility Code of "D." The "D" Code is passed on to the SDX. However, for dually entitled beneficiaries, the "D" Code cannot be generated on the SDX—*i.e.,* dually eligible DACs aren't identified by the "D" Code. *See, e.g.,* Items 55, 78, and 80 for role of "D" Code.

to such information was through the SSA, which maintains SSI records. The "SSA has the obligation to identify persons who lost SSI eligibility due to the initial receipt or increase in the amount of DAC benefits. Moreover, the budgetary information necessary to determine the amount of DAC benefits which the Medicaid program must disregard is also information exclusively in the control of the federal agencies." Item 70, ¶ 9. The State claimed it "repeatedly articulated its needs so that the necessary information could be transferred from the federal agencies to it." *Id.*, ¶ 13. However, NYSDOH suggestions were often rejected by the federal defendants who failed to provide the information that they had promised. *Id.*, ¶¶ 14–17.

The State took issue with the federal government's position that because it has no responsibility for making Medicaid eligibility determinations under the letter of the law,[13] it is absolved of all responsibility to implement 42 U.S.C. § 1383c(c) and is shielded from liability if a state detrimentally relies on the information provided by the government. The State pointed out that the federal government's view is contrary to a number of principles of statutory construction where courts "are generally required to construe statutes so as to achieve a practical and workable result, and to avoid objectionable results." Item 79, ¶ 6. The State argued that construing 42 U.S.C. § 1383c(c) to place the entire burden of implementation on the states leads to inefficient and objectionable results, whereby the states would have to "make discrete inquiries to local SSA offices for every individual who loses SSI." *Id.*, ¶ 7.

The State cited a November 29, 1989 letter that the federal defendants attached to Exhibit 2 of Item 78 which the federal defendants described as "instructions [to

New York State] regarding the continuation of Medicaid in situations covered by this law suit . . . ." Item 78, p. 3. Page two of the letter stated, "The data needed to identify such individuals [affected DAC cases] are included in the State Data Exchange (SDX) record periodically transmitted to the States." Item 78, Ex. 2. The State regarded it as significant that the letter did not mention any alternative method for states to identify affected DAC cases: the letter demonstrated that the states relied upon the information provided by the federal government via the SDX to identify people affected by the statute, Item 79, ¶¶ 8, 9, and that the federal government was well aware of its role in the process. The State regarded the 1989 letter as an acknowledgment by the federal defendants of their "statutory role in the implementation of 42 USC 1383c(c) . . . ." *Id.*, ¶ 10. However, the problem, in the State's eyes, has been the federal defendants' development of a "flawed system of providing states with the information needed to make the statutorily required Medicaid determinations." *Id.*, ¶ 11. "This is not an instance where DOH has refused to pay medicaid benefits but rather where DOH was unable to identify recipients." Item 70, ¶ 11.

The State also pointed out that plaintiffs had taken the position that the original apportionment of fees suggested by Mr. Sheldon in the first motion for fees was inappropriate (70 percent State, 25 percent federal, 5 percent County). The State joined plaintiffs in their reassessment, urging 50–50 apportionment among the State and federal defendants, noting that any apportionment to the State of over 50 percent "would not accurately reflect the events of this litigation and would instead be grossly unfair." *Id.*, ¶ 23. The State

---

**13.** See *supra,* Section III.

also expressed doubt whether settlement for greater than 50 percent of the fees could be approved. *Id.,* ¶ 24.

Lastly, the State questioned the payment rate of plaintiffs' attorneys at $150.00 per hour for all ten years of the litigation. Item 81. While it did not object to the $150.00 per hour rate for the "more current" years of the litigation, it expressed concern that such a figure "may be excessive" during the litigation's earlier years. *Id.* In a letter to the court, the State defendant suggested a method by which the hourly fees could be adjusted downward. Item 86. See discussion, *infra,* Section VI(D), n. 16.

## V.  County Defendant's Arguments

Defendant Deborah Merrifield, Commissioner of the Erie County Department of Social Services, has participated only minimally in the discussion concerning attorneys' fees. The County referred to the first Motion for Attorneys' Fees, Item 17, in which Mr. Sheldon suggested that the court apportion only five percent of the responsibility to defendant Merrifield. Item 72. The County then argued that following the Partial Stipulation of January 31, 1995, Merrifield's involvement in the case has been minimal, given that the outstanding issues involved plaintiffs and the other defendants, and not ECDSS. Accordingly, the ECDSS counsel requested that no attorneys' fees be apportioned against it, given that its "actions or lack of actions were in full compliance with the directions, policies and procedures of the defendant New York State Department of Social Services . . . ." *Id.,* ¶ 9.

## VI.  Analysis

### A.  Was the Federal Defendants' Position Substantially Justified?

■ The EAJA provides that a court shall award fees and expenses to the prevailing party in an action brought by or against the Government "unless the court finds that the position of the United States was substantially justified, or that special circumstances make an award unjust." 28 U.S.C. § 2412(d). The statute requires proof that: (1) the claimant is a prevailing party; (2) the Government's position was not substantially justified; (3) no special circumstances make an award unjust; and (4) the fee application be submitted to the court within 30 days of the entry of the final judgment. *Kerin,* 218 F.3d at 189. The government challenges the award of EAJA fees on the grounds that its position was substantially justified and that the claimants were not prevailing parties under *Buckhannon.* Item 85. The government did not assert that special circumstances existed or that the fee application was untimely.

■ Pursuant to *Buckhannon,* a prevailing party is one who has been awarded some relief by a court. 121 S.Ct. at 1839. Settlement agreements enforced through a consent decree "may serve as the basis for an award of attorney's fees." *Id.* at 1840. Court ordered consent decrees create the "material alteration of the legal relationship of the parties" necessary to permit an award of attorneys' fees. *Id.* (citations omitted). Clearly, the Partial Settlement and the Supplemental Settlement, as consent decrees enforced by the court, serve as the basis for an award of attorneys' fees. The plaintiffs are prevailing parties under *Buckhannon;* the government's argument to the contrary has no merit.

■ I also find that the position of the United States was not substantially justified. To decide whether the plaintiffs may recover attorneys fees' under the EAJA, two questions must be answered: "(1) what is the 'position of the United States'?; and (2) was this position 'substantially jus-

tified?'" *Williams v. Sullivan,* 775 F.Supp. 615, 617 (S.D.N.Y.1991). The "position of the United States" has been defined to include:

> both 'the position taken by the United States in the civil action,' as well as 'the action or failure to act by the agency upon which the civil action is based.' In adding this definition, Congress made clear that for EAJA purposes, a court should inquire into both the underlying agency determination affecting the party, as well as the Government's litigation strategy in defense of that determination.

*Smith by Smith v. Bowen,* 867 F.2d 731, 734 (2d Cir.1989), citing 28 U.S.C. § 2412(d)(2)(D). Substantial justification has been defined by the Supreme Court as "'justified in substance or in the main'— that is, justified to a degree that could satisfy a reasonable person. That is no different from the 'reasonable basis in both law and fact' formulation ....'" *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (citations omitted). Furthermore, "the burden is on the Secretary to show that HHS's position was substantially justified." *Williams,* 775 F.Supp. at 618 (citations omitted). A "strong showing" is required to satisfy this burden. *Environmental Defense Fund, Inc. v. Watt,* 722 F.2d 1081, 1085 (2d Cir. 1983).

In assessing the reasonableness of the government's position, "a district court should inquire into both the underlying agency determination and the Government's litigation strategy in defense of that determination." *Reyes v. Secretary of Health & Human Services,* 807 F.Supp. 293, 298 (S.D.N.Y.1992) (citations omitted).

In this case, the attorneys are seeking compensation for successfully prosecuting the claims by the plaintiff class. In the first phase of the litigation, the issue was that plaintiffs were denied Medicaid benefits to which they were entitled, which result was contrary to 42 U.S.C. 1383c(c). In the second phase of the litigation, following the Partial Settlement in December 1995, the issue concerned proper identification of dually entitled DACs who were entitled to Medicaid benefits.

Members of the plaintiff class were clearly entitled to Medicaid benefits under Section 1383c(c). While the final decision to award or deny benefits was made by the State, that decision was not made in a vacuum. The federal government's role in the State's decision-making process was clear, and its actions in this lawsuit indicate without a doubt that it assumed responsibility to the extent it was relied upon to provide the State with necessary information to make the determination of Medicaid eligibility. The government acknowledged its role in supplying data that the states needed in order to identify the kinds of people who became class members in this litigation as early as 1989. Item 78, Ex. 2.

The court agrees with the State that the government's argument in support of its substantial justification position does not reflect the practicalities inherent in implementing the Medicaid statute, nor does it reflect the facts of this case. Once the complaint was amended to add the federal government as a defendant, the government asserted an affirmative defense that the complaint should be dismissed for failure to state a claim upon which relief can be granted, *i.e.,* the HHS Secretary "acted lawfully and in compliance with the laws and Constitution of the United States." Item 10, ¶ 10. Nevertheless, all parties, including the federal government, embarked upon settlement negotiations, apparently abandoning pursuit of that affirmative defense, and did not proceed with further litigation.

The conclusory assertion the government makes that its position was substantially justified is neither supported by the facts nor its conduct. The government asserts it was part of the solution, not part of the problem; it lauds itself for having always, and swiftly, accommodated all queries and requests put to it. But these self-serving declarations do not reveal the entire picture in this ten-year-old litigation.

As an example of the delays caused by the federal government, the State noted SSA's "inability . . . to modify its computer system to produce an indicator on the SDX record used by DOH to identify dually eligible DACs." Item 70, ¶ 15. The court accepts the government's assertion that "[m]odifying SSA's system to meet the State's needs was a difficult task." [14] Item 71, p. 10. However, I find that the problem could have been solved much earlier if the government had addressed this problem in an orderly, rather than in a vacillating, fashion. At first, the SSA reported that "dually entitled DACs cannot be identified on an ongoing basis when the information contained in the SSA computer network is transferred to the State by means of computer matches." April 19, 1996 letter of Mahoney to Sheldon, attached to Item 28.

Then, "[a]fter years of indicating that such identification could not be made, in September 1998, SSI [sic] represented such modification could be made." Item 70, ¶ 15. See Item 52. Later, as Mr. Tarantino noted for the State, SSA "recanted its position and conceded that no such identification code could be made." Item 70, ¶ 16. *See* Item 57. But eventually, "the federal agencies did design a mechanism of transmission of computerized information to DOH," which finally allowed the State to make the "necessary eligibility determinations in order for the county agencies to make medicaid payments." Item 70, ¶ 17. This resolution also allowed the Supplemental Stipulation to be signed, concluding the case.

The process of coming to a final resolution in this case involved approximately twenty-six telephone conferences and meetings between the parties and the court during 1995–2000, and a great deal of correspondence. The conferences involved detailed and extensive exchanges of information. Often, the government asserted that the computer problem could not be solved for various reasons. It cited the problems of incompatibility between the federal and State computer systems which it viewed as burdensome, time-consuming, and costly, as well as technically difficult, to modify. See Item 53. On each occasion, the court would schedule another meeting and direct the parties to try again. The court often noted that this was a federal statute, and the federal agencies had a responsibility to insure that a program would be put in place to carry out the statute's congressional mandate.

The government's ever-changing seesaw position on computer modifications, upon which the last six years of this case has turned, has not been reasonable. Clearly, the State is also responsible for delay in implementation of the program. But, the federal government's pointing the finger at the State, as if that absolves it from responsibility, does not make its own position

---

14. Many of the arguments proffered by the government relate to the minutiae of the computer programs—*e.g.,* the role of the "D" Code and the interaction between the MBR and SDX computer systems. While this information is helpful as a window into the complexity of the programming task, it does not obscure the essential fact that both federal and State defendants shared the fault and responsibility for the problems associated with the computer programs.

reasonable. This just serves to point out that both the State and federal defendants have been at fault. Only through enforced cooperation of all defendants, over a protracted period of time with oversight authority provided by the court, was this case finally resolved.

Accordingly, the court holds that the government did not make the required "strong showing" to satisfy its burden that its position was substantially justified and was reasonable in fact. Thus, attorneys' fees will be assessed against it.

**B. Apportionment of Attorneys' Fees**

■ The allocation of fee liability is a matter committed to the district court's discretion. *Koster v. Perales*, 903 F.2d 131, 139 (2d Cir.1990). In *Koster*, the Second Circuit provided the following guidance:

> Although the law governing apportionment of attorney's fees assessments remains relatively unsettled ..., district courts have appropriately considered a variety of factors in allocating fee liability including the relative culpability of the parties ... and the proportion of time spent litigating against each defendant ....
>
> On the basis of these considerations, the district court may allocate the fee award between the responsible parties, setting the percentage for which each is liable where the claims against the defendants are separate and distinct or where culpability is significantly unequal, ... or it may hold the responsible parties jointly and severally liable for the fee award.

*Id.* (citations omitted). In deciding how liability for legal fees is to be borne amongst co-defendants, "the district court should 'make every effort to achieve the most fair and sensible solution that is possible.'" *Id. (quoting Grendel's Den Inc. v. Larkin,* 749 F.2d 945, 960 (1st Cir.1984)).

**i. The County**

■ As a preliminary matter, the court agrees with defendant Erie County Department of Social Services that it should bear no responsibility for attorneys' fees. Item 72. Prior to filing this lawsuit and during the early stages of litigation, plaintiffs' attorneys registered their objections with ECDSS regarding their clients' loss of Medicaid eligibility in telephone calls and meetings with ECDSS representatives. Nevertheless, ECDSS's role has always been minimal. In addition, it has been clear throughout the ten years of litigation that resolution of the plaintiffs' problems could only be effected by the federal and State defendants. ECDSS had, at most, only derivative responsibility for plaintiffs' problems, since it relied on NYSDSS policies and procedures in making Medicaid determinations. Thus, the court will not hold defendant Merrifield, as Commissioner of ECDSS, responsible for any portion of the attorneys' fees.

**ii. The Federal and State Defendants**

In reviewing the attorneys' time sheets, attached as exhibits to the first motion for fees, Item 17, and attached to the second motion for fees, Item 68, the court relies upon the observation made by the trial court in *Koster v. Perales,* quoted by the Second Circuit, when it focused on the relative degree of culpability of the State and County defendants. "Given the 'interrelationship and overlap between their responsibilities and obligations with respect to the ... program at issue here, both under law and under the settlement agreement, an attempt to precisely balance the amount of responsibility rightfully placed upon either side would seem both a futile and wasteful task for [the court] to undertake.'" *Koster v. Perales,* 903 F.2d

131, 138 (2d Cir.1990) (citation omitted). The time sheets make clear that plaintiffs' attorneys devoted similar amounts of time to both the State and federal defendants, and much of their time was devoted to activities involving both defendants, as the issues were interwoven. Also, given the course of this litigation, this court cannot find, in the interest of fairness, that either the State or the federal government bears more responsibility than the other. Both were responsible for delays in reaching the partial and final settlement, and both ignored the requirements of § 1383c(c). While the State was mandated under law to make the determination, it had to rely on information that only the federal government possessed. Failure on the part of both the federal and State defendants resulted in plaintiffs' losing Medicaid eligibility even while they were still entitled to such benefits under law. As a result, both federal and State defendants should each be responsible for 50 percent of the attorneys' fees for plaintiffs. The fees will be assessed by holding the State defendant responsible for payment of 50 percent of the total hours expended by plaintiffs' attorneys, and the federal defendants responsible for payment of 50 percent of the total hours expended by plaintiffs' attorneys.[15] Similar to *Koster*, the court finds here as well that "the responsibility of the two defendants in this case is not significantly unequal as to make joint and several liability unjust." *Id.* at 139.

## C. Calculation of Fees against the Federal Government

■ The fees against the federal government are to be calculated under the EAJA. As indicated *supra*, Section III, the statutory hourly cap for cases filed between October 1, 1981 and March 29, 1996 is $75.00 per hour. The $75.00 rate applies to this case, which was commenced in September 1991. Still, the court "may choose to apply a cost of living adjustment to this ceiling, as measured by the Consumer Price Index. See 28 U.S.C. § 2412(d)(2)(A); *Harris v. Sullivan*, 968 F.2d 263, 265 (2d Cir.1992)." *Kerin*, 218 F.3d at 194. Because work on this case began in 1991 and continued for approximately ten years, "the hourly rate under § 2412(d)(1)(A) should only be increased by the corresponding Consumer Price Index for each year in which the legal work was performed." *Id.* (citations omitted). The court will calculate the fees pursuant to that Index. In addition, Section 2412(d) provides for fee awards above the statutory ceiling only in certain limited circumstances, such as "the limited availability of qualified attorneys for the proceedings involved" or attorneys having "some distinctive knowledge or specialized skill needful for the litigation in question." *Kerin*, 218 F.3d at 191 (citations omitted). These limited circumstances have not been established.

The federal defendants have attached a chart indicating the Consumer Price Index All Urban Consumers—(CPI–U), to be used for actions commenced before March 29, 1996. Item 75, Ex. C. Following the CPI–U chart, they provide three flow charts which break down the number of hours expended by plaintiffs' counsel per year, from 1991 to 2000, and arrive at attorneys' fees by two different computational methods. The first chart uses the apportionment figures suggested by Mr.

---

**15.** As it turns out, holding the State and federal defendants responsible for 50 percent each of plaintiffs' attorneys' hours results in disparate assessments, given the differences in hourly rates provided by the EAJA and 42 U.S.C. § 1988. Paraphrasing George Orwell's famous comment in *Animal Farm*, "All [assessments] are equal, but some [assessments] are more equal than others." (Middlesex: Penguin Books, 1951) 114.

Sheldon in his first motion for attorneys' fees—*i.e.*, federal government 25 percent; State government 70 percent; and County government 5 percent, and figures the fees under the EAJA for the federal government. The federal chart also calculates attorneys' fees at the $150.00 per hour rate for the State and County governments. The second chart provides apportionment between the State and federal defendants at 50–50 of the hourly total, with the EAJA hours augmented by the CPU–I. It also calculates the State's hours at $150.00 per hour. The third chart provides a "compromise" calculation pursuant to a 70–25–5 percent apportionment among the State, federal, and County defendants. The figures on these charts represent what the federal government anticipates it would be required to pay should it be assessed attorneys' fees, depending on how the court, in its discretion, resolves the matter.

### D. Calculation of Fees against New York State

▓▓▓▓ The court considers an attorneys' fee award assessed against New York State pursuant to 42 U.S.C. § 1988(b), which provides that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorneys' fee as part of the costs." Under this statute, the court calculates a "lodestar" figure, which is derived by multiplying a reasonable hourly rate by the number of hours reasonably expended during the litigation. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Gierlinger v. Gleason*, 160 F.3d 858, 876 (2d Cir.1998). The court should only include hours that are supported by the attorneys' time records. *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir.1998).

New York State has attached a chart to Item 86 which it urges the court to consider in the calculation of attorneys' fees. While it divides its responsibility equally with the federal defendants, in terms of hours expended, the State balks at paying plaintiffs' attorneys their requested $150.00 per hour rate for each year of litigation. The State argues that if $150.00 per hour is reasonable in year 2000, such a rate "would therefore be unreasonable in the year 1991." Item 86, p. 1. To remedy this problem, the State, in furthering its request that lower hourly rates be applied during the course of this ten-year litigation, has devised a method for calculating the hourly rate.[16]

▓▓▓▓ The court declines to adopt the State's suggested method of assessing fees against it, and awards plaintiffs a $150.00 per hour rate for each year of litigation, which the court finds is "reasonable" pursuant to 42 U.S.C. § 1988. In their first motion for attorneys' fees, submitted in 1995, the three attorneys set forth their employment histories and expertise in litigating Social Security, SSI, and/or Medicaid cases. Mr. Sheldon asserts that the

**16.** Using the year 2000 EAJA hourly rate, $138.28 as a baseline, it creates a fraction by putting the EAJA rate for each particular year (1991–2000) as the numerator over the $138.28 figure as the denominator, and arrives at a percentage figure reflecting the difference in those rates. For example, for 1991, the fraction is $109.36 (the EAJA rate for 1991) over $138.28, which is 79 percent. Then the State calculates 79 percent of the $150.00 hourly rate to establish an "adjusted

hourly rate" for each year, so that "both defendants can be treated similarly." Item 86, p. 2. Taking 1991 as an example, 79 percent of $150.00 is $118.50, which plaintiffs then multiply by 50 percent of the total hours expended by the attorneys for that year to arrive at the figure the State would be required to pay for attorneys' fees for that year. Although the State cited no authority for this method, it does possess a certain logic.

$150.00 per hour rate is "well within the prevailing rate in Buffalo for work on significant matters in federal court performed with experience ranging from 13 to 24 years." Item 17, Ex. A, ¶ 27. He adds that, "I have recently received a rate of $150 per hour on a court-approved stipulation on a case pending in the Western District of New York ..." *Id.* Similarly, Mr. Lopez–Soto discussed his extensive litigation experience as a statewide disability specialist with the Greater Upstate Law Project. He recounted how his time had been valued at $100.00 an hour in 1989, and at $120.00 per hour in 1990 in cases decided in the Western District of New York. Considering his additional experience and cost of living increases brought about by inflation, he requested a $150.00 per hour rate as well. Item 17, Ex. B, ¶ 5. Lastly, Judith Munger, staff attorney at Heritage Centers, discussed her extensive litigation experience in Social Security, SSI and Medicaid law. She too requested a billing rate of $150.00 per hour based on the same reasoning articulated by Mr. Sheldon. Item 17, Ex. C, ¶¶ 3, 5.

In *Beckford v. Irvin,* 60 F.Supp.2d 85 (W.D.N.Y.1999), then Magistrate Judge Heckman, reviewing the reasonableness of attorneys' fees pursuant to 42 U.S.C. § 1988(b), surveyed a number of cases in the Western District which awarded fees. She cited *Myree v. Local 41, Int'l Bhd. Of Elec. Workers,* 847 F.Supp. 1059 (W.D.N.Y.1994), *aff'd* 29 F.3d 620 (2d Cir. 1994), where Judge Skretny determined "that an attorney with nine years of litigation experience [was] entitled to an hourly rate of $150 for work performed from 1989 through 1993." *Beckford,* 60 F.Supp.2d at 88. Those rates, according to Chief Judge

Larimer in *Almutt v. Cleary,* 27 F.Supp.2d 395, 400 (W.D.N.Y.1998) "would be even higher today [1998]." All attorneys in this case had over nine years of litigation experience before the suit was initiated.

Accordingly, the court finds that the $150.00 per hour rate sought by attorneys Sheldon, Lopez–Soto, and Munger is reasonable in light of their experience and the prevailing rates in the Western District of New York. However, it must be pointed out that "it is appropriate to reimburse attorney's [sic] for their travel time at 50% of their normal hourly billing rate." *Beckford,* 60 F.Supp.2d at 89, citing cases. From the time sheets submitted, Mr. Sheldon spent 5.6 hours of travel time, Mr. Lopez–Soto spent 26.9 hours of travel time, and Mrs. Munger spent 3 hours of travel time (a total of 35.5 hours). Given the 50–50 federal-State apportionment, 17.75 hours in travel time will be billed the State at $75.00/hour.

### E. The Rate Chart

The second row of the chart below, prepared by this court, indicates the total hours expended by all three attorneys during each particular year, a figure which defendants do not challenge. The third and sixth row indicate the 50–50 allocation in hours assessed against the federal and State defendants. The fourth row indicates the EAJA $75.00 baseline, as modified by the CPU–I for each year. The fifth row indicates the amount the federal government is assessed per year. The seventh row indicates the State's $150.00 per hour figure, as a constant for each year considered. The eighth, or last, row indicates the amount the State government is assessed for each year of the litigation.

| Year | 1991 | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|---|
| Total Hrs. | 125.3 | 181.7 | 178.1 | 96.2 | 127.8 |
| 50% of hrs. | 62.65 | 90.85 | 89.05 | 48.1 | 63.9 |
| EAJA Rate | $ 109.36 | $ 112.67 | $ 116.00 | $ 119.02 | $ 122.36 |
| Amount | $6,851.40 | $10,236.07 | $10,329.80 | $5,724.86 | $7,818.80 |
| 50% of hrs. | 62.65 | 90.85 | 89.05 | 48.1 | 63.9 |
| $150/hr. | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 |
| Amount | $9,397.50 | $13,627.50 | $13,357.50 | $7,215.00 | $9,585.00 |

| Year | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|
| Total Hrs. | 31.55 | 28.1 | 31.5 | 29.9 | 9.3 |
| 50% of hrs. | 15.77 | 14.05 | 15.75 | 14.95 | 4.65 |
| EAJA Rate | $ 125.95 | $ 128.87 | $ 130.88 | $ 133.76 | $ 138.28 |
| Amount | $1,986.23 | $1,810.62 | $2,061.36 | $1,999.71 | $ 643.00 |
| 50% of hrs. | 15.77 | 14.05 | 15.75 | 14.95 | 4.65 |
| $150/hr. | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 |
| Amount | $2,365.50 | $2,107.50 | $2,362.50 | $2,242.50 | $ 697.50 |

**Total Award of Attorneys' Fees:**

1.  Federal — EAJA      $ 49,461.85

2.  New York — § 1988      $ 62,958.00
                    − 1,331.25   travel time 17.75 hrs @ $75 hr:
                    $ 61,626.75

3.  County                      0

        Total         $111,088.60

## CONCLUSION

For the foregoing reasons, plaintiff's motion for attorneys' fees, Item 68, is granted. Plaintiffs' counsel is entitled to a total of $111,088.60 in attorneys' fees, $49,461.85 of which shall be paid by the federal defendants, and $61,626.75 shall be paid by the State defendant.

So ordered.