**Elsa GULINO et al., Plaintiffs,**

v.

**THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK and the New York State Education Department, Defendants.**

**No. 96 Civ. 8414(CBM).**

United States District Court, S.D. New York.

Nov. 25, 2002.

318

Barbara Olshansky, Center for Constitutional Rights, Joshua Sohn, Piper Rudnick LLP, for Plaintiff Class.

Michael A. Cardozo, Corporation Counsel of the City of New York, by: Donald Sullivan, for Defendant City Board of Education, of counsel.

Eliot Spitzer, Attorney General of the State of New York, by: Jane A. Conrad; Bruce B. McHale; Frederic L. Lieberman, Assistant Attorneys General, for Defendant State Education Department, of counsel.

## OPINION AND ORDER

MOTLEY, District Judge.

The facts of this case were recited in depth in this court's decision certifying the class and familiarity with that ruling is presumed. *Gulino v. Board of Education of City School District of New York,* 201 F.R.D. 326 (S.D.N.Y.2001) (*"Gulino"*). Briefly, the plaintiff class is comprised of African American and Latino educators in the New York City public school system ("Teachers") who have either lost their teaching licenses or have been prevented from obtaining a full teaching license because of the requirement that they achieve a satisfactory score on one of the challenged tests, the National Teacher Core Battery Exam ("NTE") or the Liberal Arts and Sciences Test of the New York State Teacher Certification Examination ("LAST"), the successor to the NTE. The tests were developed and administered by defendant State Department of Education ("SED" or "the Department").

Plaintiffs allege that the use of the tests as a requirement for obtaining permanent teaching certificates has an impermissible disparate impact on African–American and Latino teachers in New York City public schools, in violation of Title VII of the Civil Rights Act of 1964, § 701 *et seq.,* as amended, 42 U.S.C. § 2000e *et seq.,* Plaintiffs allege that white test-takers passed both tests at a rate that is statistically significantly higher than the rates for African Americans and Latinos. Plaintiffs further allege that the tests in question were misused and do not measure whether the test-takers are qualified to be teachers. Many of the plaintiffs have remained employed as teachers with defendant New York City Board of Education ("BOE" or "the Board"), some in the same classrooms teaching the same subjects. They assert, however, that they have suffered harm in that they have had their salaries reduced and have been denied employment opportunities, rights and benefits.

Both defendants have filed a Motion for Summary Judgment on various grounds, seeking that some or all of the claims be dismissed and that they each be declared not liable as employers. Plaintiffs have filed a Motion for Partial Summary Judgment, seeking a declaration that both defendants *are* in fact employers under the Title VII, that the tests were misused and that they have established a prima facie case of disparate impact. For the reasons that follow, both defendants' and plaintiffs'

motions are GRANTED IN PART and DENIED IN PART.

### *LEGAL STANDARDS*

#### *Summary Judgment*

Summary judgment should only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 n. 4, 106 S.Ct. 2548, 2552 n. 4, 91 L.Ed.2d 265 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir.1999) (internal quotations and citations omitted). In order to prove that a genuine issue of material fact exists, a plaintiff "may not rest upon the mere allegations or denials of the pleading[s]," but must by affidavit or otherwise "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548; *Twin Labs, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir.1990). In this vein, the Second Circuit has noted that "conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996). Of course, this standard applies with equal force in discrimination cases as it would in any other case in the federal courts. *See Ashton v. Pall Corp.*, 32 F.Supp.2d 82, 87 (E.D.N.Y.1999) (" 'the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation' "). Thus, courts within the Second Circuit "have not hesitated to grant defendants summary judgment in such cases where ... plaintiff has offered little or no evidence of discrimination." *Scaria v. Rubin*, 1996 WL 389250, 1996 U.S. Dist. LEXIS 9659, at *14 (S.D.N.Y.1996) (Peck, M.J.), *aff'd*, 117 F.3d 652 (2d Cir.1997).

In assessing the record to determine whether genuine issues of material fact are in dispute, courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). When parties have filed cross motions for summary judgment, each has the burden of presenting evidence in support of its motion. *See Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir.1988). However, if the moving party meets its initial burden, the non-moving party may not rely on conclusory allegations or speculation to create factual disputes. Instead, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) (internal quotations and citations omitted) (alteration in original).

### *DISCUSSION*

**I.** **PLAINTIFF'S CLAIMS ARE BARRED NEITHER BY RES JUDICATA NOR BY THE *ROOKER-FELDMAN* DOCTRINE.**

In 1996–97 a group of teachers who had lost their licenses because of their failure

to pass the NTE joined their union President, Sandra Feldman (in her capacity as President) in bringing a State court proceeding under Article 78 to review the revocation of their licenses ("*Feldman* Proceeding"). Sullivan Decl. Ex. L ("*Feldman* Petition"). They alleged: 1) a violation of due process; 2) that they were not provided sufficient notice of the test requirements in advance; and 3) that the mis-use of the tests (which had not been validated for the uses to which they were put) was arbitrary and capricious. *Id.,* ¶ 1.[1] New York Supreme Court Justice Herbert Kramer dismissed their action, holding that the decision to revoke their licenses was not arbitrary and capricious (Weingarten Aff. Ex. C ("*Feldman* Final Order") at 6), "given [that] an appropriate and validated test, such as the NTE" was used to make the decision. *Id.* at 5.[2]

Based on that state court judgment, both defendants argue that the claim before the court is barred under the doctrine of res judicata, or, in the alternative, under the *Rooker–Feldman* doctrine. The court disagrees.

### A. Res Judicata

 Under New York law, the doctrine of res judicata, or claim preclusion, applies "to the parties in a litigation and those in privity with them...." *Gramatan Home Investors Corp. v. Lopez,* 46 N.Y.2d 481, 486, 414 N.Y.S.2d 308, 386 N.E.2d 1328 (1979). Defendants argue that although the named plaintiffs in this case were not actually involved in the prior litigation, they are in privity with the teacher's union, ("the UFT", or "the Union"), which was a plaintiff.

As a preliminary matter, it is not clear to the Court that the Union was in fact subject to the *Feldman* Order. There is no dispute that Sandra Feldman, in her capacity as President of the UFT, was an original petitioner. *See Feldman* Petition. That does not settle the question, however, since Justice Kramer denied petitioner's claims for class certification (Weingarten Aff. Ex. B ("*Feldman* Order 10/7/96"), at 9), which plaintiffs argue had the effect of dismissing the Union from the case altogether: Weingarten Aff., ¶ 12. By the time the case was resolved, it does not appear that Justice Kramer even contemplated Ms. Feldman (or the UFT) as a petitioner; his final order curiously omits any reference to the Union or its President, opening: "Upon the foregoing papers in this Article 78 proceeding, petitioners Jennifer Jones, Brenda Parsons-English and Jose Drunker filed a petition, dated January 11...." *Feldman* Final Order at 2. On the next page, Justice Kramer refers to "both petitioners herein."[3] *Id.* at 3. Finally, his holding seems not directed at the Union at all: "The court finds that respondents' action in terminating the licenses of petitioners Parsons-English and Jacoby–Raglievich ... is not arbitrary and capricious...." *Id.* at 5.

---

1. Plaintiffs in the prior proceeding did not allege employment discrimination, or any discrimination whatsoever. *See generally id.*

2. That clause constitutes the only "finding" the state court seems to have made regarding the validity of the test. It is not clear whether Justice Kramer's opinion held that it was valid for all uses or merely that it had been validated on some level.

3. Drunker and Jones' claims were found to have been time-barred and a fourth petitioner, Karen Jacoby–Raglievitch, was added. Accordingly, there were two petitioners left whose petitions "were found to be timely filed and the merits thereof [were] determined [t]herein." *Id.* at 3.

■ Even if the UFT was a party at the end of the Feldman proceeding, however, to establish that Gulino et al. were in privity with the Feldman petitioners, defendants must show that "the interests of the non-party [in the instant case, Gulino et al.] can be said to have been represented in the prior [*Feldman*] proceeding." *Green v. Santa Fe Indus.*, 70 N.Y.2d 244, 253, 519 N.Y.S.2d 793, 514 N.E.2d 105 (1987).[4] Additionally, that representation must have been adequate and without conflicts of interest. *Evergreen Bank v. Dashnaw*, 246 A.D.2d 814, 668 N.Y.S.2d 256, 258 (3d Dept.1998). Even in the absence of a relationship between the parties, privity may exist when a non-party controlled the conduct of the prior litigation. *Tamily v. General Contracting Corp.*, 210 A.D.2d 564, 566, 620 N.Y.S.2d 506 (3d Dept.1994).

Defendants argue that individual members of the UFT (and all teachers in New York City are required to join the Union (*see* Sullivan Decl. Ex. N, (Wilds Dep.) at 20)) are automatically in privity with the Union. For that proposition, they rely on *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275 (2d Cir.2000), in which the Second Circuit held that union members could not relitigate an issue that had been settled by consent judgment between the President of the Union (in his capacity as President) and the Department of Corrections.

*Monahan*, however, is inapposite both legally and factually. First, it did not involve an application of New York law on res judicata—it was a federal question case from start to finish and, as noted, *supra* at note five, it is New York law that

must be applied in the instant case. Second, the issue in *Monahan*—restrictions on sick leave—was much less complicated than the one involved here, and the representational capacity of the Corrections Officers Union (COU) as a plaintiff was much greater than the UFT's. In terms of sick leave, all members of the COU were in the same position; in the case at bar, where only black and latino members have brought this Title VII action, it is clear that the UFT, whose members are largely white, does not adequately represent their position. Had the Union brought a claim sounding in discrimination based on race, it would have incurred a conflict with the white members it was representing. Thus, *Evergreen Bank's* privity requirements are not met. 668 N.Y.S.2d at 258

Finally, plaintiffs supply an affidavit of Randi Weingarten, current president of the UFT, who served as general counsel to the Union at the time of the *Feldman* proceeding (in which capacity she oversaw the litigation), explaining that neither the class representatives in the present case nor their attorneys had any role in the *Feldman* Proceeding. Weingarten Aff., ¶¶ 5–7. While defendant BOE notes that three of the putative class members in the case at bar were named as petitioners in the *Feldman* proceeding (Sullivan Decl. Ex. P (Shapiro Decl.)), it does not contend that the plaintiffs here played any role in directing that proceeding. Thus, *Tamily's* privity requirements for a non-party are not met. 210 A.D.2d at 566, 620 N.Y.S.2d 506.

In its Reply, Defendant BOE submits that it does not matter if the UFT was not considered in the *Feldman* Final Order,

---

4. Federal courts are required to give the same preclusive effect to a prior State court judgment as that judgment would receive in courts of the State. *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Feldstein v. New York State Office of Mental Health*, 846 F.Supp. 1089, 1096 (E.D.N.Y.1994)(citing 28 U.S.C. § 1738).

since the unity of interests between the plaintiffs in that case and the plaintiffs here is manifest. For this proposition they cite *Chase Manhattan Bank v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir.1995): "Res judicata may bar non-parties to earlier litigation not only when there was a formal arrangement for representation in, or actual control of, the earlier action but also when the interests involved in the prior litigation are virtually identical to those in later litigation."[5]

On one level, the plaintiffs here and the petitioners in the *Feldman* Proceeding are united—they would both have been pleased with a ruling that struck down the use of the tests at issue and that awarded them back pay from the time of their demotion for failure to pass said tests. The alignment of interests ends there, however, since the Union brought the initial *Feldman* action on behalf of all of its members who held valid teaching certificates but had failed the tests. Amended Petition, ¶¶ 78, 84, 90, 96. As noted above, since many of those members were white, an employment discrimination claim based on race (either under Title VII or New York State or City Human Rights Law (N.Y.HRL)) was not available to the Union, at least not without creating a conflict with many of the members it was representing. For that reason, the Feldman petitioners did not bring a discrimination claim. Moreover, the plaintiffs here were barred from doing so (had they sought to intervene) since they had not yet received their Right to Sue Letters from the EEOC. See Lieberman Decl. Ex. A (Complaint), ¶ 20 (Right to Sue letter issued on or about October 11, 1996); *Feldman* Order denying class certification issued October 7, 1996. *See also, Bracey v. Safir*, 1999 WL 672564 (declining to apply preclusion doctrine when plaintiffs could not have brought Title VII claim in earlier action because they had not yet received right to sue letters).[6]

### B. The Rooker–Feldman Doctrine

 Under the *Rooker–Feldman* doctrine developed from two Supreme Court cases with those names, a federal district court lacks jurisdiction over cases that ef-

---

5. Interestingly, this rule would seem to allow parties not in privity to be bound by prior judicial determinations. The appellate panel in *Chase Manhattan Bank*, declined to find the claim precluded by res judicata, holding that in order to do so, a court must find that there was a "substantial identity of the incentives of the earlier party with those of the party against whom res judicata is asserted." Like the court today, the panel did not so find.

6. Defendant Board asserts that plaintiffs could have sued under State or City Human Rights law without a Right to Sue letter and cites *Bracey*, 1999 WL 672564 at *2 n. 4 (S.D.N.Y.1999) for support. That note in *Bracey*, however, in no way supports the Board's position on this issue; the court refused to find federal claims precluded "where those claims could not have been raised in a prior Article 78 proceeding" even if they could have been raised in some fashion under state law. *Id.* (citations omitted).

The Board further asserts that the lack of a right to sue letter should not bar application of res judicata, citing *Woods v. Dunlop Tire Corp.*, 972 F.2d 36 (2d Cir.1992) *cert. denied*, 506 U.S. 1053, 113 S.Ct. 977, 122 L.Ed.2d 131 (1993), in which the Second Circuit held that a Title VII claim could be dismissed on res judicata grounds even though the plaintiff had deferred bringing the claim while her action based on a violation of the Labor Management Relations Act (LMRA) was pending. *Woods* is distinguishable from the case at bar on many levels, and it's precedential authority and persuasive value are, consequently, minimal. First, the original LMRA cause of action in that case was based on a federal, not a state remedy; second, the plaintiff in each proceeding was the same, not another party arguably not in privity; third, the plaintiff's decision to await resolution of her LMRA claim was optional (*id.* at 39–40), not a requirement like the Right to Sue letter.

fectively seek direct or indirect review of state court judgments.[7] Only the United States Supreme Court can hear appeals from state court judgments; federal district courts may not consider claims to reverse or modify state court holdings, as well as claims "inextricably intertwined with" prior state court determinations. *Feldman,* 460 U.S. at 483 n. 16, 103 S.Ct. 1303.

■ Defendants submit that in the prior proceeding, the question of whether the NTE was a valid test was litigated, and the state court held that it had been properly validated. Since plaintiffs' claim here is predicated on the invalidity of the exams in question, defendants argue that the claims are sufficiently intertwined with the earlier litigation. According to defendants, in other words, if this court were to find for the plaintiffs after trial, that ruling would, in effect, work a reversal of the state court's holding in the prior litigation. In effect, this is a collateral estoppel argument; if the entire proceeding is not barred by res judicata (claim preclusion), then, say defendants, at least the *issue* of whether the NTE is valid is precluded.

■ An examination of the relevant case law reveals flaws in defendants' argument. First, application of the *Rooker–Feldman* doctrine requires that "the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in

the first proceeding." *Bracey v. Safir,* 1999 WL 672564, *3 (citing *Colon v. Coughlin,* 58 F.3d 865, 869 (2d Cir.1995)); *see also, Giles v. City of New York,* 41 F.Supp.2d 308, 312 (S.D.N.Y.1999)("[B]ecause preclusion rules target the party who seeks to relitigate identical claims or issues, a party faces preclusion only if it had a sufficiently full and fair opportunity to litigate the dispute in the prior proceeding" (citation and internal quotations omitted)). Even if the issue of validation of the NTE was litigated fully and fairly in the Feldman proceeding (and, again, based on the ten word "finding" in the *Feldman* Final Order, that is not at all clear), based on the reasons enunciated above, it does not appear that the Gulino et al. played any role in the earlier litigation. Further, the Second Circuit has raised the issue (without deciding it) of whether certain Article 78 proceedings are sufficiently rigorous to support an application of issue preclusion.[8]

Put simply, the connection between the instant plaintiffs and the petitioners in the *Feldman* Proceeding is tenuous at best. Additionally, this court has doubts about the nature and scope of the *Feldman* Final Order, including which parties it may have bound and exactly what level of validation the court found for the NTE. Given these uncertainties, an application of the res judicata or *Rooker–Feldman* doctrines is in-

---

7. *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). The Second Circuit has applied the *Rooker–Feldman* doctrine in recent years. *Moccio v. New York State Office of Court Administration,* 95 F.3d 195 (2d Cir.1996).

8. "We think there is a substantial question as to whether, under New York law, collateral estoppel should ever apply to fact issues determined in a prison disciplinary hearing and reviewed for substantial evidence in an Article

78 proceeding, given the procedural laxity of such prison hearings and the limited nature of substantial-evidence review." *Colon,* 58 F.3d at 869 (internal quotations and citations omitted). While the *Feldman* Proceedings did not take place in the prison context, the nature of the review in the Article 78 proceeding was more limited: Justice Kramer applied the "without foundation in fact" standard to the decision against the plaintiffs. *Feldman* Final Order at 5 (citing New York Educ. Law §§ 2590–j, [2], 2573[1][a]; Chancellor's Regulation C–205, ¶ 22[a] ).

appropriate. *Cf. Richards v. Jefferson County, Alabama*, 517 U.S. 793, 797–98, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996) ("extreme applications of the doctrine of res judicata may be inconsistent with a federal right that is fundamental in character. . . . [T]he general consensus in Anglo–American jurisprudence [is] that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party. . . . This rule is part of our deep rooted historic tradition that everyone should have his day in court") (citations and internal quotations omitted).

In *Richards*, the Court declined to find a second challenge to a taxation scheme barred by res judicata, noting: "In *Hansberry v. Lee*, 311 U.S. 32, 37, 61 S.Ct. 115, 85 L.Ed. 22 (1940), we held that it would violate the Due Process Clause of the Fourteenth Amendment to bind litigants to a judgment rendered in an earlier litigation to which they were not parties and in which they were not adequately represented." *Richards*, 517 U.S. at 794, 116 S.Ct. 1761. This court is not convinced that Gulino et al. were in privity with the parties in the *Feldman* Proceeding, nor that their interests were adequately represented. Accordingly, defendants' motion for summary judgment based on res judicata and/or the *Rooker–Feldman* doctrine is DENIED.

**II. PLAINTIFFS CLAIMS ARE BARRED NEITHER BY THE STATUTE OF LIMITATIONS NOR BY THEIR FAILURE TO FILE A NOTICE OF CLAIM.**

Both defendants urge this court to dismiss some or all of plaintiffs' claims as time-barred. The Department, facing only Title VII claims, argues that any claims which had to be asserted prior to August 27, 1995 are barred, since that is the cutoff date established by counting back 240 days from April 23, 1996, the date on which the named plaintiffs filed their charges of discrimination.[9] The Board joins in that argument with respect to the Title VII claims and argues further that plaintiffs' State and City Human Rights Laws (N.Y.HRL) claims are barred both by the statute of limitations and by plaintiffs' failure to file a notice of claim. See N.Y. Educ. Law § 3813.

**A. *Statute of Limitations***

■ The first question is whether any claims at all are time-barred. Plaintiffs urge this court to apply the continuing violations doctrine developed over many years by the Second Circuit. Under that doctrine, when a plaintiff alleges a continuing violation of Title VII, as opposed to discrete violations, "the plaintiff is entitled to bring suit challenging all conduct that was a part of that violation, even conduct that occurred outside the limitations period." *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir.1994); *see also, Gomes v. Avco*, 964 F.2d 1330, 1333 ("[T]he normal statute of limitations rules under Title VII do not apply where 'employees are hired or refused employment [or promotion] pursuant to a continuous pattern or policy of discrimination'" (quoting *Miller v. International Tel. & Corp.*, 755 F.2d 20, 25 (2d Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985); *Association Against Discrimination v. City of Bridgeport*, 647 F.2d 256, 274 (2d Cir.1981) ("When a Defendant has engaged in a continuous policy of discrimination, acts in furtherance of that policy are not viewed

---

**9.** The Department's use of a 240 day filing period limit is an error. Because New York has a work-sharing agreement with the Equal Employment Opportunity Commission (EEOC), the cutoff date should be established by counting back 300 (not 240) days from the filing date. *Ford v. Bernard Fineson Development Center*, 81 F.3d 304, 308–11 (2d Cir. 1996).

in isolation ... [and] if the charge has been filed no later that 300 days after the last act by the Defendant pursuant to its policy, the Plaintiff may recover for earlier acts as well"). It is certain that the policy in question qualifies as "continuing" by the Second Circuit's definition. *See Association Against Discrimination*, 647 F.2d at 275 ("There can be no doubt that the continuous-policy principle governs the present case ... [which involved] the giving of the 1975 exam that was not job related and had discriminatory impact...").

In *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Supreme Court invalidated at least part of the Ninth Circuit's continuing violation doctrine. The relevant questions now before this court are whether the Court invalidated the doctrine altogether, and, if not, whether the Second Circuit's doctrine has survived in whole or in part. In *Morgan*, the Court noted:

> In the Ninth circuit, a plaintiff can establish a continuing violation that allows recovery for claims filed outside of the statutory period in one of two ways. First, a plaintiff may show "a series of related acts one or more of which are within the limitations period." *Ibid* [*Morgan v. National R.R. Passenger Corp.*, 232 F.3d 1008 (9th Cir.2000) *aff'd* in part, *rev'd* in part, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) ("*Morgan*")]. Such a "serial violation is established if the evidence indicates that the alleged acts of discrimination occurring prior to the limitations period are sufficiently related to those occurring within the limitations period." *Ibid.* Second, the plaintiff may establish a continuing violation if he shows a systematic policy or practice of discrimination that operated, in part, within the

limitations period—a systemic violation. *Id.* at 1015–16.

*Morgan*, 536 U.S. at ——, 122 S.Ct. at 2069. In *Morgan*, the Court was faced only with the first type of continuing violation, as the facts make clear. Plaintiff Abner Morgan, an African American man, claimed that he was "consistently harassed and disciplined more harshly than other employees on account of his race." *Id.* at 2068 (citation omitted). Specifically, he alleged, *inter alia*, that over the course of five years, he: (1) was given lesser jobs than white employees (*Morgan*, 232 F.3d at 1011) (2) was disciplined more harshly than white employees (*id.* at 1101–12); (3) was denied training which white employees were given (*id.* at 1012); (4) suffered an assault (*id.*); (5) suffered retaliation for complaining to his congresswoman (*id.* at 1011); (6) was exposed to racial slurs (*id.* at 1013); and finally (7) was fired. *Id.* There was no allegation of a systemic policy, but rather allegations of a series of discrete acts. The Ninth Circuit declared that "[i]n light of the relatedness of the incidents, we find that Morgan has sufficiently presented a genuine issue of disputed fact," and thus reversed the district court's grant of partial summary judgment in favor of defendant. *Id.* at 1017.

In reversing that part of the circuit court's decision, the Supreme Court distinguished between "discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire [which] are easy to identify," and a "hostile [work] environment," which "cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* at 2073. The Court held that each in the series of acts which comprised the continuous violation in *Morgan* was discrete. *Id.* Further, the Court ruled that "[e]ach incident of discrimination and

each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' Morgan can only file a charge to cover discrete acts that 'occurred' within the appropriate time period." *Id.* (footnote omitted). In other words, the Court struck down the continuing violations doctrine as applied to serial violations. Explicitly, however, the Court did not reach certain types of continuing violations: "We have no occasion here to consider the timely filing question with respect to 'pattern-or-practice' claims brought by private litigants as none are at issue here." *Id.* at 2073 n. 9.

The Court's disclaimer is curious, since the second type of continuous violation included in the Ninth Circuit's doctrine—the systemic violation—encompasses more than just "pattern-or-practice" cases. Pattern-or-practice cases involve intentional discrimination by defendants. *See, e.g., Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 158 (2d Cir.2001) ("To succeed on a pattern-or-practice claim, plaintiffs must prove ... that intentional discrimination was the defendant's 'standard operating procedure'") (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). The Second Circuit has used the terms "policy and practice" or "policy or practice" in referring to cases involving a policy, which, while neutral on its face, has a disparate impact on a protected group. *See Association Against Discrimination*, 647 F.2d at 275; *Robinson*, 267 F.3d at 160; *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 111 (2d Cir. 2001). The *Morgan* Court was not faced with a systemic violation either in the form of a pattern-or-practice case, or in the form of a "policy or practice" case. Accordingly, the court assumes that the continuing violations doctrine, still in effect for pattern-or-practice cases, also remains in force for "policy or practice" cases.[10]

The allegedly unlawful acts in this case are on-going in nature. Beginning in 1991, New York City teachers were not allowed to apply for a City license until they had passed the tests at issue. *See* Pl.s' Facts, ¶ 74 (City School District of the City of New York Chancellor's Regulation C–265).[11] The policy in place thus affected them each day after they failed the test, until they took it again and passed. If they failed again, the policy continued to affect them. They were not allowed to apply for a City license each day after they failed the test and every day thereafter until they eventually passed. In contrast to a plaintiff who is fired or demoted and can seek to be rehired or re-promoted, plaintiffs here are locked into their substitute statuses because of an on-going policy

---

**10.** At least one commentator has conflated the terms "systemic violations" and "pattern-or-practice." *See Leading Cases, III. Federal Statutes and Regulations, B. Title VII—Continuing Violations*, 116 HARV. L.REV. 352, 361 ("[P]laintiffs may [continue to] ... invoke the [continuing violations doctrine] in asserting systemic (pattern-or-practice) violations, which were not at issue in *Amtrak* [*Morgan* ]"). The Ninth Circuit, like the Second, has used the term "policy and practice" in reference to a systemic violation. *See Green v. L.A. County Superintendent of Schools*, 883 F.2d 1472, 1480 (9th Cir.1989) ("The continuing violation theory generally has been applied in the context of a continuing policy and practice of discrimination on a company-wide basis ....") (cited in *Leading Cases*, 116 HARV. L.REV. at 357 n. 59).

**11.** Defendants agree that there is no dispute as to this fact. *See* SED Response to Pl.s' Facts, ¶ 74; BOE Response to Pl.s' Facts, ¶ 74. It is undisputed that prior to 1991, New York City teachers were allowed to obtain a City license without having passed the NTE. *See* Pl.s' Facts, ¶¶ 60, 61; SED Response to Pl.s' Facts, ¶¶ 60, 61 (agreeing); BOE Response to Pl.s' Facts, ¶¶ 60, 61 (taking issue only with the terminology).

which prohibits them from seeking a full City license.

To conclude, the court finds that the Second Circuit's continuing violations doctrine remains in effect with respect to "policy or practice" cases such as this one; the *Morgan* holding does not apply to the instant case. Accordingly, plaintiffs may challenge the on-going conduct related to the NTE or the LAST, including that ongoing conduct that would not have been actionable within the 300 day period prior to filing with the Equal Employment Opportunity Commission (EEOC). The relevant part of each defendant's motion for summary judgment is therefore DENIED.

█ Further, it is well settled that "New York courts require the same standard of proof for claims brought under [the analogous parts of] the Human Rights Law as for those brought under Title VII" (*Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d. Cir.1998)), and thus the court "can analyze these claims in tandem." *Id. See, e.g., Miller Brewing Co. v. St. Div. of Human Rights*, 66 N.Y.2d 937, 498 N.Y.S.2d 776, 489 N.E.2d 745 (1985). Accordingly, that part of BOE's motion arguing the same issue with respect to the claims under New York State and City

Human Rights Laws (N.Y.HRL) is likewise DENIED.[12]

### B. Plaintiffs' Failure To File a Notice of Claim

█ Defendant BOE argues that plaintiffs' NYHRL claims are barred because they did not follow state statutory procedures which require that they file a notice of claim.[13] Plaintiffs concede that, generally, bringing a NYHRL claim requires that a notice of claim be filed. New York Educ. Law § 3813. They argue that they are excused from that requirement, however, by the New York Court of Appeals's decision in *Mills v. County of Monroe*, 59 N.Y.2d 307, 311, 464 N.Y.S.2d 709, 451 N.E.2d 456 (1983), which held: "[A]ctions that are brought to protect an important right, which seek relief for a similarly situated class of the public, and whose resolution would directly affect the rights of that class or group are deserving of special treatment. The interests in their resolution on the merits override the State's interest in receiving timely notice before commencement of an action." The Board cites a different case, *Doyle v. Board of Education of Deer Park Union Free School District*, 230 A.D.2d 820, 646 N.Y.S.2d 842 (2d Dep't 1996), which held that the claim of a group of employees who

---

12. The court can imagine, however, at least one group of plaintiffs whose claims are barred, even under the continuing violations doctrine. That group would consist of those who failed the tests initially, in 1991, e.g., but subsequently passed and were awarded their licenses prior to the cutoff date (which is June 29, 1995, calculated by counting back 300 days from the EEOC filing date of April 24, 1996). For them, the allegedly discriminatory policy no longer had an effect after the cutoff date sufficient to pull in their claims before it—a requirement of the continuing violations doctrine. *See Association Against Discrimination v. City of Bridgeport*, 647 F.2d 256, 274 (2d Cir.1981) ("When a Defendant has engaged in a continuous policy of discrimination, acts in furtherance of that policy

are not viewed in isolation ... [and] *if the charge has been filed no later than 300 days after the last act by the Defendant pursuant to its policy*, the Plaintiff may recover for earlier acts as well" (emphasis added)); *see also, Morgan*, 536 U.S. at ——, 122 S.Ct at 2072 ("The emphasis ... 'should not be placed on mere continuity'; but on 'whether any present violation exist[s]' ") (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977)).

13. Plaintiffs dropped their NYHRL claims against SED. *See* Stipulation and Order of Voluntary Dismissal dated September 11, 2002.

brought a discrimination action under NYHRL seeking retirement benefits they had been denied was barred by their failure to timely file a notice of claim. Defendant BOE submits that the case is directly on point and urges this court to adopt the position that when employees seek retirement benefits (as Gulino et al. do here) or any other monetary damages, the plaintiffs' interest in the claim cannot trump the State's interest in receiving notice of the action.

The court rejects this argument for four reasons. First, *Doyle* is distinguishable from the case before the court since it was not class action and thus less likely to result in a benefit for a large group. Second, while it is true that the plaintiffs here are seeking monetary damages as one part of their claim, should they win the injunction they also seek (against using the tests) that will have much larger and public ramifications. Third, *Doyle* was an intermediate appellate decision, whereas the cases cited by plaintiffs come from the highest court. Fourth, *Doyle* is less than one page and thus difficult to assess how factually similar to the instant matter. Finally, in a lengthy, thorough opinion, *Union Free School District No. 6 et al. v. New York State Human Rights Appeal Board*, 35 N.Y.2d 371, 362 N.Y.S.2d 139, 320 N.E.2d 859 (1974), the New York Court of Appeals addressed the facts quite similar to the case at bar and rejected the argument asserted by the Board here:

> It is true, of course, that this proceeding was triggered by the complaint of ... one teacher and that the relief granted below will redound to the benefit of that teacher as well as to the benefit of other teachers similarly situated. Such circumstances cannot be allowed, however, to obscure the fact that advantages which accrue to these teachers stem not from their rights of contract or other individual entitlement but rather flow as

an appropriate and intended consequence of the vindication ... of the public's interest in the elimination of discrimination based on sex—a public interest duly declared by legislative enactment.

*Id.* at 380, 362 N.Y.S.2d 139, 320 N.E.2d 859. The public's interest in the elimination of discrimination based on race, alleged in the instant case, is as great and has likewise been duly declared by legislative enactment. *See* Title VII, 42 U.S.C. § 2000e *et seq.*

In light of the foregoing, that part of BOE's motion for summary judgment seeking to have plaintiffs' NYHRL claims dismissed owing to their failure to file a notice of claim is DENIED.

### III. BOTH DEFENDANTS ARE EMPLOYERS UNDER TITLE VII

Plaintiffs seek summary judgment declaring both defendants liable as employers under Title VII. Defendants, for their part, seek summary judgment declaring them *not* liable as employers under Title VII, but for different reasons. Defendant SED claims that it is not truly involved in employing teachers and its administration of the tests in question is a licensing function pursuant to its police power, which courts have held to be outside the Title VII definition of an employer. The Board, on the other hand, argues that since SED required that teachers pass these tests, it had no discretion regarding whether to decertify the teachers who fail and thus cannot be held accountable for having done so. For the reasons that follow, the court rejects defendants' arguments and grants plaintiffs' motion for summary judgment on this issue.

#### A. State Education Department

Defendant SED argues that the certification of teachers is an exercise of

the State's police power and thus is analogous to the licensing of doctors, dentists, accountants, lawyers and other professionals. Title VII applies only to employers, SED argues, and the Department's role in licensing does not make it an employer. There is a long line of federal appellate case law (from other jurisdictions—this question has not been addressed by the Second Circuit, yet) supporting the proposition that a State exercising its police power licensing function is not subject to Title VII. *See Fields v. Hallsville Independent School District*, 906 F.2d 1017 (5th Cir.1990) (Texas Department of Education not subject to Title VII by virtue of its licensing of teachers); *see also, George v. New Jersey Board of Veterinary Medical Examiners*, 794 F.2d 113 (3d Cir.1986) (veterinary licensing board not an employer under Title VII); *Haddock v. Board of Dental Examiners of California*, 777 F.2d 462 (9th Cir.1985) (dental licensing board not an employer under Title VII); *Woodard v. Virginia Board of Bar Examiners*, 598 F.2d 1345 (4th Cir.1979) (Virginia Board of Bar Examiners not subject to Title VII); *Tyler v. Vickery*, 517 F.2d 1089 (5th Cir.1975) (Title VII does not apply to the Georgia State Bar Examiners). In the Eastern and Southern Districts, courts have agreed that licensing pursuant to police powers is outside of Title VII. *United States v. New York State Dept. of Motor Vehicles*, 82 F.Supp.2d 42, 49–52 (E.D.N.Y. 2000) (*"DMV"*) (bus driver licensing was exercise of police power and thus not subject to Title VII); *Mikhail v. Bentley*, 1997 WL 225799, 1997 U.S. Dist. Lexis 6136

(S.D.N.Y.1997) (medical licensing not subject to Title VII).

Plaintiffs, however, contend that a teaching certificate is entirely different from a license that is required for lawyers, doctors and other professionals in order to practice. Those occupations are wholly regulated by the state—one cannot practice as a lawyer or a doctor if one does not have a state license. Teaching, by contrast, is done by many without the license. Private school teachers are not licensed, for example, and, more tellingly, most members of the plaintiff class in this case were still teaching without their licenses at the time the class was certified. *See Gulino v. Board of Education of City School District of New York*, 201 F.R.D. 326, 329 (S.D.N.Y.2001) (*"Gulino"*). Thus, argue plaintiffs, the exams at issue here are much closer to civil service exams, passage of which is required in order for promotion. In other words, teacher certification is an exercise of the *proprietary* power (not the *police* power) of the state in its capacity as employer, used to evaluate employees and set salaries, which *is* subject to Title VII.

There are only two federal appellate decisions addressing the specific question of whether teacher certification tests are subject to Title VII and they are in conflict. In *Fields v. Hallsville Independent School District*, 906 F.2d 1017 (5th Cir.1990), the Fifth Circuit concluded that tests were not subject to Title VII; in *Association of Mexican–American Educators v. State of California*, 231 F.3d 572 (9th Cir.2000)(en banc) (*"AMAE"*), the Ninth Circuit held that they were.[14]

---

**14.** In addition to *AMAE,* plaintiffs list several district court opinions in support of their position; defendants do not. *See, e.g., York v. Alabama State Board of Education,* 581 F.Supp. 779 (M.D.Ala.1983) (issuing preliminary injunction prohibiting the enforcement of a test requirement that had an adverse

racial impact on African American teachers); *Allen v. Alabama State Board of Education,* 190 F.R.D. 602 (M.D.Ala.2000) (approving settlement of class action suit challenging Alabama's public school teacher certification process as racially discriminatory under Title VII); *United States v. State of North Carolina,*

Unhappily for defendants, *AMAE* is more recent, more thorough and more on-point. In short, it is simply more persuasive than *Fields*. It considered the relevant case-law, including the cases relied on by the defendants. Rather than rehashing the Ninth Circuit's reasoning, an extended quote is in order:

> The cases on which Defendants rely [*Fields, George, Haddock, Woodard, Tyler, supra*] are not controlling for two reasons. *First,* the state's high level of involvment in the operation of local public schools distinguishes this case from those that Defendants cite. In those cases, licensing was the entire connection between the plaintiffs and the defendants; here, the CBEST [the challenged certification test in the case] is but one aspect of pervasive state control. *Second,* the CBEST is not merely an ordinary licensing examination; it applies only to public school employees. In other words, the State of California is acting pursuant to its proprietary, as well as its police, power.

There is no overarching "licensing" exception to Title VII. The cases that Defendants cite stand for a related but narrower proposition—that Title VII does not apply when *the only* connection among the licensing agency, the plaintiff, and the universe of prospective employees is the agency's implementation of a general licensing examination.

400 F.Supp. 343 (E.D.N.C.1975) (enjoining use of NTE as violating Equal Protection Clause); *Morgan v. Hennigan,* 379 F.Supp. 410 (D.Mass.1974) (desegregation suit successfully challenging Massachusett's Board of Education misuse of NTE and its adverse impact on African American teacher applicants); *Georgia Association of Educators, Inc. v. Nix,* 407 F.Supp. 1102 (N.D.Ga.1976) (civil rights action against the State of Georgia's examination requirement for teacher certification).

*AMAE,* 231 F.3d at 582–83 (emphasis in original).

The court's reasoning applies equally in the instant case. First, defendant SED has a similarly "high level of involvement in the operation of local public schools," as plaintiffs demonstrate: SED provides curriculum and curriculum-based state-wide tests for virtually all public schools (Pl.s' Facts, ¶ 197); the State requires students to take and pass Regents examinations in order to progress from grade to grade and then to graduate and uses the results of these tests to evaluate schools and school-districts (*id.,* ¶ 198); SED has assisted the Board in recruiting teachers for New York City schools (*id.,* ¶ 202) and maintains a Teacher Recruitment Clearinghouse data-bank, which is used by school districts to recruit teachers (*id.,* ¶ 203); SED's Commissioner's regulations delineate professional development requirements for public school teachers (8 N.Y.C.R.R. § 80–3.6), regulate incidental teaching positions (8 N.Y.C.R.R. § 80–5.3) and regulate substitute teaching in public schools (8 N.Y.C.R.R. § 80–5.3) (Pl.s' Facts, ¶ 207); [15] SED's Commissioner's regulations set the maximum required number of teaching periods (8 N.Y.C.R.R. § 100.2(i.)) (SED Response to Pl.s' Facts, ¶ 222). The list goes on,[16] but these facts suffice to show that SED plays a significant role in the operation of local schools, as well as in the employment of teachers.

15. Defendant SED admits all of these facts but denies that they are material (*see* corresponding paragraphs in SED Local Rule 56.1 Statement in Opp'n to Pl.s' Mot. for Summ. J.); this is a curious position given that they strive mightily in their papers to show that SED is not involved in the operations of local schools (see SED Mem. in Opp'n, pp. 7–10).

16. *See* Pl.s' Facts, ¶¶ 193–238 (some of which are contested, most of which are not).

The *Fields* opinion was based on the fact that "[t]he *only* evidence presented by [plaintiffs] suggesting control is the Texas State Board of Education's administration of the TECAT exam [the challenged certification test in the case] and its ability to decertify teachers who fail the exam." *Fields*, 906 F.2d at 1019 (emphasis in original). Plaintiffs in that case apparently made no effort, prior to the appeal, to demonstrate that the State was involved in the operation of schools, and the court declined to examine the evidence offered at that late stage. *Id.* at 1019 n. 3; the panel even suggested that, had plaintiffs presented evidence of the state's larger role in their initial case to the district court (rather than waiting until the appeal) the outcome might have been different. *Id.* at 1019–20. In the instant case, as noted *supra*, plaintiffs have made such a showing.

Second, as in *AMAE*, the certification exams in the instant case are required only for public, not private, school teachers. *See* Educ. Law § 3001.[17] Furthermore, the undisputed facts of this case demonstrate that certification for teachers is not the same as licensing for other professionals, like lawyers and doctors. Many plaintiffs who were unable to pass the tests are still teaching, most of them in the same classroom; the consequences they suffered were demotions to substitute status and the attendant reductions in salary and benefits. If the state were truly acting exclusively pursuant to its police power—the essence of which is "protecting the public,"[18] in this case, presumably, from unqualified teachers—the plaintiffs would not have been allowed to remain in the same classroom for years after failing the tests. No one contends that lawyers and doctors are allowed to practice indefinitely after failing the bar exam or the medical boards, respectively. Since the current practice with regard to teachers who fail the certification exams cannot be said to grounded exclusively in the need to protect the public, *AMAE*'s reasoning applies here: teacher certification "is not *solely* an exercise of the state's police power. Rather, it is an exercise of both the state's police power *and* its proprietary power; and it is the exercise of proprietary power that subjects the state to the coverage of Title VII in this case." *AMAE*, 231 F.3d at 584 (emphasis in original).

 There are three tests used to determine whether an entity qualifies as an employer in the Title VII context: 1) whether the defendant affirmatively inter-

---

17. This fact distinguishes teacher certification from the bus driver licensing at issue in *United States v. New York State Dep't of Motor Vehicles*, 82 F.Supp.2d 42 (E.D.N.Y.2000) (*"DMV"*), in which the court held that SED was outside the Title VII definition of employer when its regulations required school bus drivers to meet certain physical specifications. In that case, the State regulations at issue applied to *all* school bus drivers, not merely public school bus drivers (*id.* at 54) and so SED's claim that it was acting pursuant to police powers was significantly more credible. Additionally, the *DMV* decision was based in large part on the *panel* holding in *AMAE* (195 F.3d 465 (9th Cir.1999), *withdrawn*, 208 F.3d 786 (9th Cir.2000) (*see* 82 F.Supp.2d at 53 ("Applying the factors suggested by the Ninth Circuit [in the panel decision] ...")), a decision whose reasoning was rejected by the Ninth Circuit sitting en banc. As such, DMV*'s* persuasive value, already low owing to the difference in factual circumstances contemplated, is further diminished.

18. According to SED at oral argument. Transcript of Oral Arg. 10/23/02 at 40; *see also, Gonzalez v. City of New York*, 135 F.Supp.2d 385, 393 (E.D.N.Y.2001) (age discrimination challenge to emergency room regulation rejected since the "regulation is clearly within the government's police power to protect public health or safety" (citing *Dent v. West Virginia*, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889)).

**332**

fered with or affected the plaintiff's direct employment or access to employment opportunities;[19] 2) whether the defendant can be considered a "single" or "joint" employer together with the direct employer under standards borrowed from the National Labor Relations Board;[20] and 3) whether the direct employer is merely an agent or instrumentality of the defendant for the purposes of the discriminatory practice.[21] Plaintiffs assert that SED satisfies all three tests (even though it need satisfy only one). The court agrees that SED qualifies as an employer under the first, "interference" test and so it need not reach the second or third.[22]

■■■ It is well-settled that an entity that is not a direct employer of a Title VII plaintiff nevertheless may be liable it if interferes with or "significantly affects access of . . . [plaintiffs] to employment opportunities." *Spirt v. Teachers Insurance and Annuity Ass'n,* 691 F.2d 1054 (2d Cir.1982), *vacated and remanded on other grounds,* 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983)). The origin of this test can be found in *Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338 (D.C.Cir. 1973). In *Sibley* the plaintiff was a male nurse who claimed gender discrimination because the hospital where he worked referred female nurses to both male and female patients who requested a private nurse, but referred only female nurses to

female patients. Thus, even though the hospital was not directly employing Sibley (because patients paid private nurses directly), it was held to be interfering with his access to employment opportunities. The D.C. Court of Appeals held that the hospital, while not the direct employer of a private nurse, could be held liable under Title VII because it was able to "forecl[e], on invidious grounds, access by an individual to employment opportunities otherwise available to him." *Id.* at 1341.[23]

In *AMAE,* the Ninth Circuit applied the *Sibley* test and concluded that the State of California was liable to teachers under Title VII, even though it was not a direct employer. *AMAE,* 231 F.3d at 582. According to the court, the State of California, in requiring that teachers pass the CBEST in order to be certified, in effect "dictates whom the districts may and may not hire." *Id.* at 582. In other words, according to the en banc panel, defendants in *AMAE* "interfered with Plaintiffs' employment opportunities with local school districts in California by requiring, implementing, and administering the CBEST." *Id.* at 581 (citation and internal punctuation omitted). In the case at bar, SED, by requiring passage of the NTE or LAST, similarly interferes with plaintiffs' employment opportunities and thus satisfies the *Sibley* interference test.

---

19. *AMAE,* 231 F.3d at 582.

20. *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1240 (2d Cir.1995).

21. *Cf. Vulcan Society v. Fire Department of City of White Plains,* 82 F.R.D. 379, 396 (S.D.N.Y.1979).

22. The court notes, however, that SED did not address the latter two tests in its papers.

23. The Second Circuit has applied *Sibley's* interference test. *See Spirt v. Teachers Insurance and Annuity Ass'n,* 691 F.2d 1054, 1063

(2d Cir.1982) ("[I]t is generally recognized that the term 'employer,' as it is used in Title VII, is sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an 'employer' of an aggrieved individual as that term has generally been defined at common law" (citations and internal quotation marks omitted)), *vacated and remanded on other grounds,* 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983).

In reaching its holding, however, the *AMAE* required a connection between plaintiffs and defendants beyond mere "interference"; the court also noted the "peculiar degree of control that the State of California exercises over local school districts." *Id.* at 581. While SED's level of control may or may not rise to California's, by its own admission, "the New York Constitution requires the legislature to make available a sound basic education; ... the State regulates education and ... local school districts are legislative creations...." SED Mem. in Opp'n at 7 (citations omitted). Further, the state plays a significant role in determining curriculum, required subjects and graduation requirements. *See, e.g.,* 8 N.Y.C.R.R. 3.35(a)(1) (SED Commissioner's regulation denying State funding to schools which do not "submit[ ] all required reports, maintain[ ] an approved course of study" or do not "make[ ] use of the Regents examinations in the high school grades"). Combined with the facts recited *supra* with reference to the licensing issue, there is considerable evidence that the State has a sufficient control over the operation of local schools to bring it within Title VII's definition of an employer. In addition, in a variety of ways, SED has a direct hand in the employment of City teachers: it participates in recruitment (*see* Pl.s' Ex. 44

(Aff. of Charles C. Mackey, Jr.), ¶¶ 18, 23 (SED inserts recruitment flyers encouraging employment in City schools in all teaching certificates, and SED maintains Teacher Recruitment Clearinghouse database for use by local school districts)); it closely regulates professional development (*see* 8 N.Y.C.R.R. § 80–3.6); it even sets maximum hours teachers can be required to teach on a daily basis (*see* 8 N.Y.C.R.R. § 100.2(i)).[24]

In light of the foregoing, the court finds that there exists no genuine issue of material fact as to whether defendant SED qualifies as an employer under Title VII. Accordingly, that part of SED's motion seeking a declaration that it is not a Title VII employer is DENIED, and plaintiffs' motion seeking the reverse declaration is GRANTED.

### B. The City Board of Education

 Defendant BOE submits that it cannot be held liable as an employer under Title VII since it was merely following the mandates of state law as articulated in the relevant statutes and regulations. The Board should not be a defendant, it contends, "because plaintiffs are not challenging any employment practice over which the City Board had any discretion...." BOE Mem. in Support at 9.[25] This argu-

---

**24.** Plaintiffs also note that in *Spirt,* the Second Circuit adopted *Sibley's* holding and elaborated three criteria it found relevant to the determination of whether an indirect employer is liable under Title VII along with the direct employer. Liability will be found if: (1) the two entities [SED and BOE] were 'closely intertwined'; (2) the plaintiff's participation in the defendant's discriminatory program [the NTE or the LAST] was mandatory; (3) the alleged indirect employer shared in the administrative responsibilities of the program at issue. *Spirt,* 691 F.2d at 1063. At least since 1991, when passing the tests became a requirement for public school teaching under state law (second criterion), SED qualifies as an employer under the *Spirt* test. The first

and third criteria are also met, as demonstrated by the facts recited above in reference to the licensing issue.

**25.** The Board wisely makes no effort to distance itself from the actual employment (hiring, firing, paying, promoting, etc.) of teachers, since that effort would obviously be in vain. *See* SED Mem. in Partial Opp'n to BOE at 7 (reciting uncontroverted facts regarding BOE's role in employing plaintiffs, including, "plaintiffs and certified class are all present or former employees of the Board.... The Board admits that pursuant to Ed. Law. § 2590–g(2) the Board is 'for all purposes' the employer of all teachers in the City School District" (citations omitted)).

ment is without merit. As the Board concedes, "[p]rior to the 1991 law [which imposed the state requirements for all *new* teachers], a person could teach in New York City with only a City license; State certification was not required." BOE Mem. in Supp. at 7. What the Board neglects to mention in its papers is that the relevant law contained a "grandfather" clause, wherein all teachers who had applied for or received their license prior to January 1, 1991—the effective date of the new requirements—were unaffected by the new legislation. Laws of 1990, ch. 650, §§ 11,13. Thus, the decision to de-certify those teachers who had applied for or received City licenses prior to 1991 because they did not pass the NTE or the LAST was the Board's. Over 700 putative class members were protected by the "grandfather" clause and thus were subject to the discretion of defendant Board, which exercised it by de-certifying them and demoting them to substitute status. *See* Pl.s' Ex. 43 (Soule Decl.), Class 1 List (showing that 779 Class 1 members received a regular teaching appointment on or before December 1, 1990).

Furthermore, even if the Board had been acting only under state pressure, that would not suffice to shield it from liability under Title VII. The cases cited by the Board for the proposition that state actors acting pursuant to state law are not liable are, with only two exceptions, distinguishable from the instant case since they were brought pursuant to 42 U.S.C. § 1983, which has a much more stringent standard for liability than Title VII.[26] Section 1983 jurisprudence is simply inapplicable to a Title VII case; the latter, as an anti-discrimination statute, has a much broader standard of liability. *See* 42 U.S.C. § 2000e(b) ("Employer") defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, *and any agent of such a person ...."* (emphasis added); *but see Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (Section 1983 case in which Court held that a municipality is not vicariously liable for the actions of an employee unless the employee acted pursuant to a custom or policy); *see also Quinones v. City of Evanston,* 58 F.3d 275, 278 (7th Cir.1995)(clarifying that liability under anti-discrimination law is much broader than under § 1983).

The Board does offer two cases which were not brought exclusively under § 1983. In the first, *African American Legal Defense Fund, Inc. v. New York State Department of Education,* 8 F.Supp.2d 330, 333–34 (S.D.N.Y.1998), the court a dismissed Title VI claim against the Board after determining that "plaintiffs' complaint alleges causes of actions only against the State." *Id.* at 334. That case involved a challenge to the State's formula for funding schools, however, and the plaintiffs had included the Board as a defendant only to ensure that the court would have more options in fashioning a remedy. *Id.* As such, it bears no resemblance to the case before the court in

---

**26.** The following are the § 1983 cases cited by BOE: *Caminero v. Rand,* 882 F.Supp. 1319, 1325 (S.D.N.Y.1995); *Thompson v. Duke,* 882 F.2d 1180, 1185 (7th Cir.1989), *cert. denied,* 495 U.S. 929, 110 S.Ct. 2167, 109 L.Ed.2d 496 (1990); *Surplus Store & Exchange, Inc. v. Delphi,* 928 F.2d 788, 790–92 (7th Cir.1991); *Bethesda Lutheran Homes &* *Servs., Inc., v. Leean,* 154 F.3d 716, 718 (7th Cir.1998); *Bigford v. Taylor,* 834 F.2d 1213, 1222–23 (5th Cir.); *McMahon v. Novello,* 192 F.Supp.2d 54, 66 (W.D.N.Y.2001); *Koster v. Perales,* 903 F.2d 131, 139 (2d Cir.1990); *Unger v. Blum,* 117 A.D.2d 607, 498 N.Y.S.2d 154, 155) (2d Dept.1986).

which there is no question that defendant BOE played a significant role in the actions taken against plaintiffs.

The only Title VII case the Board cites, *Andreucci v. City of New Haven,* 117 F.Supp.2d 123 (D.Conn.1999), like *African American Legal Defense Fund, supra,* provides no support for the Board's position; it is so factually dissimilar from the case before this court that BOE's decision to cite it is perplexing. In a prior lawsuit seeking a declaratory order, a Connecticut trial court (sustained on appeal) ordered the New Haven Fire Department to change its promotional procedures, since they violated both the city's charter and civil service regulations. *Andreucci,* 117 F.Supp.2d at 124 (citing *New Haven Firebird Society v. Board of Fire Commissioners of New Haven, et al.,* 32 Conn.App. 535, 630 A.2d 131, *cert. denied* 228 Conn. 902, 634 A.2d 295 (1993)). As a result of that order, a number of white firefighters had their promotions vacated and so brought a Title VII action in *Andreucci.* A close reading of that case reveals that the court granted defendants' motion for summary judgment because "the promotional process for New Haven firefighters has been rigorously tested by virtue of the state litigation and clearly meets the bona fide seniority or merit system exemption from Title VII." *Id.* at 125. The court did not hold, as the Board contends, that the defendant was shielded from liability because it was acting pursuant to a court order,[27] but rather that the plaintiffs failed to meet their evidentiary burden in making out a prima facie case. Accordingly, *Andreucci* has no persuasive value at all.

The Board is unable to cite case-law in support of its position because it does not exist. It is well-settled that Title VII preempts any state laws in conflict with it. *See, e.g., Guardians Association v. Civil Service Commission,* 630 F.2d 79, 104–05 (2d Cir.1980) (*"Guardians I"*) ("Title VII explicitly relieves employers from any duty to observe a state hiring provision 'which purports to require or permit' any discriminatory employment practice"); *Kirkland v. New York State Dept. of Correctional Serv.,* 552 F.Supp. 667, 675–76 (S.D.N.Y. 1982) ("[i]t is clear that state law must yield to federal law in a Title VII case"); *Hill v. Berkman,* 635 F.Supp. 1228, 1239 (E.D.N.Y.1986) ("[i]t is clear that state legislation in conflict with Title VII is void under the Supremacy Clause"), *overruled on other grounds by, Roper v. Department of Army,* 832 F.2d 247 (2d Cir.1987); *Quinones,* 58 F.3d at 277 ("A discriminatory state law is not a *defense* to liability [for a municipal agency] under federal law; it is a *source* of liability under federal law" (emphasis in original)).

In light of the foregoing, that part of defendant Board's motion for summary judgment that seeks a release from liability under Title VII's definition of employer is DENIED. Since there is no doubt that the Board is a traditional employer, as well as one under Title VII (see facts recited *supra* at note 22), plaintiffs' cross motion seeking the opposite is GRANTED.

**IV. THE BOARD OF REGENTS IS NOT A NECESSARY PARTY.**

▆ Defendant SED urges the court to grant summary judgment on the theory that this court lacks jurisdiction inasmuch

**27.** Even if the *Andreucci* court had so held, that holding would be inapplicable to this case, where the Board claims it was acting pursuant to a state law—the Board could have sought a declaratory judgment, whereas the New Haven Fire Department in *Andreucci* was *already bound* by the declaratory judgment issued in *New Haven Firebird Society, supra.*

as plaintiffs have failed to sue the New York State Board of Regents ("BOR" or "the Regents"). The Department asserts that it is merely an administrative appendage of the Regents: an impotent functionary, a cog in an educational policymaking machinery which is programmed and operated solely by the Regents. The Department argues that it is endowed with no discernible policy making authority. In addition, it cannot waive the Regents' regulatory requirements that plaintiffs must pass a test to become provisionally certified to teach in the New York public schools. Even if it truly wanted to, defendant SED suggests, it could not effectuate an order of this court with respect to the existence, use and/or administration of the tests in question. Whereas the plaintiffs, the Department asserts, have sued the wrong party, the court is bereft of jurisdiction and this entire case must be dismissed.

The Department's "jurisdictional" argument fails insofar as it is both borne out of a mistaken apprehension of the law and predicated upon a misleading apprehension of the facts which inhere in this case. First, as plaintiffs correctly observe, the question of whether the Department is a proper defendant in this litigation is not dependant upon the inclusion or exclusion of the BOR as a defendant. In short, the argument that "[b]ecause plaintiffs ... have not named ... the ... Regents [as a party in this case], the Court has no jurisdiction" is a non sequitur: Regardless of the Regents' status as a party in this action, the Department, inasmuch as it is a qualified employer pursuant to Title VII, see discussion *supra* at III.A., is a proper defendant, subject to plaintiff's claims under that statute.

Second, since it is an employer under Title VII, and since plaintiffs may accordingly pursue claims against it, regardless of the presence of BOR in this action, it both can and must give effect to an order issued by this court granting any or all relief requested by plaintiffs. Injunctive relief ordered by a federal court is binding on all those in privity with the defendant. *See* Fed.R.Civ.P. Rule 65(d). Commenting on this rule in *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661 (1945) the Supreme Court noted:

> The Federal Rules of Civil Procedure provide [in Rule 65(d)] that: "Every order granting an injunction and every restraining order is binding only upon the parties to the action their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." This is derived from the common law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in "privity" with them, represented by them or subject to their control.

*Id.* at 14, 65 S.Ct. 478. The record, even as provided in the Department's somewhat disingenuous description of the substantive significance of the chain of command between SED and BOR, pellucidly reflects that SED and BOR are in privity with respect to the architecture and day-to-day functioning of the educational policy-making apparatus in New York. If the Department is subject to, for example, an injunctive order of this court, so are the Regents. As the Supreme Court observed in *Regal Knitwear*, "[i]n essence it is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Id.* at 14, 65 S.Ct. 478. Neither the SED nor the BOR can avoid the reach of the injunctive powers of this

court, regardless of whether plaintiff pursues the BOR as a defendant in this action. Plaintiffs have identified a proper defendant and have properly pleaded a case against it under Title VII.

Although the foregoing is sufficient to dispose of the Department's motion, the court would like to underscore that the Department's portrayal of its role vis-a-vis the Board of Regents regarding the formulation and administration of policy is misleading. A few examples, in addition to the litany cited in plaintiff's motion papers, suffice to establish the broad policy making authority enjoyed by the Department in relation to the Regents. *See, e.g.,* Ed. Law § 3004 ("The commissioner shall prescribe, subject to the approval of the regents, regulations governing the examination and certification of teachers employed in all public schools of the state . . . ."). To the extent that § 3004 makes it abundantly clear that the commissioner writes the rules at issue in this litigation, an order of this court is properly directed at the Department. Defendant's attempt to seize upon language such as "subject to the approval of the Regents" pursuant to its "jurisdictional" argument is a non-starter in light of Fed.R.Civ.P. 65(d). Since the Regents are in privity with the Department, they would be bound by an order of this court directed at the activity of the Department.

Perhaps even more compelling an example of the Department's authority is described in Ed. Law § 3004–c, which states: "When the commissioner determines that a certification should be denied, the applicant shall be afforded notice and the right to be heard and offer proof in opposition in accordance with the regulations of the commissioner." This provision is interesting in at least two relevant respects. First, it makes explicit reference to regulations promulgated by the commissioner. Again, perhaps the Regents ultimately adopt, formally or otherwise, the regulations which come across their table; it is clear, however, that the Department is developing, articulating and issuing the substantive rules in this area. In addition, and of especial significance, Section 3004–c is remarkable for what it does not say: that is, the provision is silent with respect to the approval of the Board regarding the denial an applicant's certification. According to Section 3004–c, SED's commissioner is in charge here. He or she decides who is in and who is out.[28]

In light of the foregoing, the relevant part of the Department's motion for summary judgment is DENIED.

## V. ACTIONS PRIOR TO JANUARY 1, 1991

The Department further argues that plaintiffs fail to state a claim against SED for any actions taken prior to January 1, 1991. Prior to that date, the Department claims, New York City teachers were not required to satisfy state certification requirements. Plaintiffs' own statement of undisputed facts reflects that the Department is correct. *See* Pl.'s Facts, ¶¶ 60, 61, 74–76.

---

**28.** Notwithstanding the fact that it has policy making responsibility in this context, SED's attempt to hang its jurisdictional hat on the hook of, *inter alia, McMillian v. Monroe County,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997), a case which was decided explicitly in the context of a Section 1983 claim, confounds the court. The Department cites no case law and provides no discernible explana-

tion to support its (wholly implicit) contention that a "jurisdictional" analysis articulated explicitly in the context of a Section 1983 claim ought to have force in a Title VII action. While this court is certainly not averse to the prudent application of law in novel contexts, it has been provided with no argument, persuasive or otherwise, in furtherance of such an enterprise.

Passage of a licensing examination has been required for provisional certification for most state teachers since 1984. 8 NYCRR § 80.2(q); Ed. Law § 3001. This requirement did *not* apply to the New York City School District, however, until 1991. Ed. Law §§ 2554, 2673; *see also Matter of Chavich*, 23 A.D.2d at 59, 258 N.Y.S.2d 677. Until 1991, the City was endowed with independent licensing authority. *See* Pl.'s Facts, ¶¶ 60, 61. Accordingly, it was allowed to determine its own licensing requirements, so long as they were at least substantially equivalent to those used by the State. *See* Mackey Decl., ¶¶ 16–17. In 1990, the Legislature abolished the Board of Examiners and decided that the State's requirements for teacher certification would henceforth be applicable to all teacher candidates, even in the City. *See* Laws of 1990, ch. 650; Ed. Law § 2569; Pl.s' Facts, ¶ 74. New York City teacher candidates were thus required by the State to pass the Core Battery tests pursuant to this new statute, the effective date of which was January 1, 1991. See Pl.'s Facts, ¶¶ 74–76.

The Department asserts that the State's only action affecting New York City teacher candidates prior to January 1, 1991, was SED's agreement that the Board could defer its own minimum City licensure requirement that candidates pass the Core Battery tests for up to five years, so long as applicants satisfied the other minimum City requirements. The State claims that it consented to this arrangement solely on the condition that candidates for City licensure satisfy all minimum and maximum licensure requirements, including passing the Core Battery tests, within five years. *See* Mackey Decl., ¶¶ 25, 26; Pl.'s Facts, ¶¶ 60, 61. Pursuant to this agreement, plaintiffs in this case were issued initial regular licenses by the Board. When these City-issued regular licenses were later terminated, the Department argues, it was because plaintiffs had failed to pass the Core Battery Tests adopted by the City. It appears that the SED was not involved in any way with the decision to terminate their licenses.

In light of the foregoing, plaintiffs fail to state a claim against the SED for actions taken prior to January 1, 1991. Defendant SED's Motion for Summary Judgment on this discrete issue is GRANTED.

## VI. THERE IS NO PRIVATE RIGHT OF ACTION UNDER TITLE VI.

In *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), the Supreme Court held that there is no private right of action to enforce disparate impact regulations under section 602 of Title VI, unlike the rights created in Section 601.[29] While plaintiffs concede that their action thus cannot go forward as pleaded, they note that the Tenth Circuit and several district courts have allowed such claims to proceed by amending the complaint to convert the cause of action into a § 1983 claim. *See Robinson v. State of Kansas*, 295 F.3d 1183 (10th Cir.2002) (allowing disparate impact claims to be brought under § 1983); *see also, Lucero v. Detroit Public Schools*, 160 F.Supp.2d 767 (E.D.Mich.2001)(same).

In *South Camden Citizens in Action v. New Jersey Department of Environmental Protection*, 274 F.3d 771 (2001), *cert. denied*, — U.S. ——, 122 S.Ct. 2621, 153 L.Ed.2d 804 (2002), the Third Circuit declined to follow the Tenth, disallowing § 1983 claims based on § 602. The only court in this district to consider the question has held that "the regulation at issue

---

**29.** Section 601 prohibits intentional discrimination—applicable to a disparate treatment claim; Section 602 deals with disparate impact—the claim in this case.

in this case does not create federal rights for the purposes of § 1983 . . . ." *Ceasar v. Pataki*, 2002 Dist. LEXIS 5098 at *11 (S.D.N.Y.2002). The court sees no reason to disagree with Judge McKenna's well reasoned opinion in that case.[30]

That part of each defendant's Motion for Summary Judgment arguing that there is no private right of action under Title VI is GRANTED. Accordingly, the court need not reach the question of whether there exists a sufficient nexus between federal funds and the challenged practice to sustain an action under Title VI.

## VII. ISSUES OF FACT REMAIN WITH RESPECT TO PLAINTIFFS' PRIMA FACIE CASE.

▉ Plaintiffs move for a summary judgment ruling that they have established a prima facie case. For the reasons that follow, that motion is denied.

To establish a prima facie showing in a disparate impact case, plaintiffs must establish, by a preponderance of the evidence that the employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(k)(1)(A)(i). To

make this showing, a plaintiff must (1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal connection between the two.

*Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147 (2d Cir.2001). In this case, there is no dispute as to the first or third elements: the challenged policy is the use of the NTE and/or LAST and defendants were demoted because they were unable to pass them. The only question that remains is whether plaintiffs' have shown that a disparity exists.

Plaintiffs argue that their statistical expert, Thomas DiPrete, showed a statistically significant difference between the pass rates of African American and Latino educators (roughly 45%) and white educators (roughly 85%). These results, they contend, meet the required showing for disparate impact under either: (1) the "80 percent rule" put forward by the Uniform Guidelines on Employee Selection Procedures and accepted in the Second Circuit (29 C.F.R. §§ 1607.1, 1607.4(D) (1999); *Waisome v. Port Authority of New York and New Jersey*, 948 F.2d 1370 (2d Cir. 1991), respectively); or (2) the amount of

---

**30.** Defendant SED makes an interesting argument which bears mention and comment here. The Second Circuit has decided that Title IX claims cannot be brought under § 1983. *Bruneau v. South Kortright Central School District*, 163 F.3d 749 (2d Cir.1998). The Supreme Court analyzes Title VI and Title IX claims interchangeably, since the language in the respective titles is the same. *See Sandoval*, 532 U.S. at 280, 121 S.Ct. 1511; *see also, Gebser v. Lago Vista*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998)(same). Therefore, it follows that Title VI claims cannot be brought under § 1983 in this jurisdiction.

Although the argument is persuasive, it is not air-tight. *Bruneau* concerned a schoolgirl who brought an action against her teacher and assistant superintendent (in addition to the school district) for failing to protect her

from the sexual harassment of her peers. The court declined to allow a § 1983 claim based on a violation of Title IX for two reasons: (1) Title IX itself "established a complex administrative enforcement scheme to ensure compliance with its provisions." 163 F.3d at 756 (citing 34 C.F.R. § 100.7(a)-(d)); and (2) "the Supreme Court has ruled that Title IX implicitly permits an individual to bring a private cause of action." *Id.* (citing *Cannon v. University of Chicago*, 441 U.S. 677, 709, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)).

The first reason applies to the case before this court. The administrative regulations enforcing the Title IX are the same as those enforcing Title VI. The second reason, however, does not apply; *Bruneau* was written before *Sandoval*, which, as defendants note, holds that there is no private right of action under § 602 of Title VI.

standard deviations required to show statistical significance. *See, e.g., Guardians I*, 630 F.2d at 86 & n. 4. While courts usually require at least two standard deviations, here, plaintiffs' expert claims that there are between eight to ninety standard deviations on the different tests. *See* Pl.s' Exh. 23 ("Diprete Report") at 3–9. DiPrete also stated that the pass rates of African–American and Latino test-takers was less than 80 percent that of white test-takers. *Id.* at 13. Plaintiffs are correct that these results, if uncontested, would entitle them to summary judgment in regard to their prima facie case.

Defendant SED attacks these results on three grounds. The first two are inappropriate in the instant case, but the third does establish that there exists a "genuine issue as to [a] material fact." Fed.R.Civ.P. 56(c). Since there remains a material fact for trial, the court need not address the arguments at length. To save time at trial, however, the court will explain why the first two attacks SED mounts are misplaced.

### A. Plaintiffs' Expert Failure To Consider Variables Other Than Race/Ethnicity

▇▇▇ The Department notes, correctly, that plaintiffs' expert analyzed the pass rates for respective groups with respect to race only; he did not consider other factors in reaching his conclusions. McHale Decl. Ex. B (Diprete Dep.) at 95–96. SED argues that the expert's failure to consider other variables, such as, *inter alia*, quality of schools attended, grade point average, facility in English and socioeconomic factors (DiPrete Dep. at 135–50) render his report of little or no probative worth. Citing disparate treatment cases [31] or disparate impact cases involving several criteria used to evaluate employees, SED asserts that the Second Circuit has disregarded evidence offered by experts who failed to consider sufficient variables in their analyses.

The Department is confused regarding the law. In disparate treatment cases, plaintiffs must prove discriminatory intent,[32] and so although statistics may be used, since they can only show correlation they cannot be direct proof. In order to demonstrate the specific racial motivation in a disparate treatment case, therefore, plaintiffs must control for multiple variables, to eliminate the likelihood that the employment action was the result of non-discriminatory factors. *See Ottaviani*, 875 F.2d at 367.

In disparate impact cases, however, it is well-settled that plaintiffs do not need to show specific racial motivation on the part of the employer,[33] at least when the causal connection between the challenged practice and the adverse employment decision

---

31. SED cites, *inter alia*, the following disparate treatment cases: *Ottaviani v. State University of New York*, 875 F.2d 365 (2d Cir. 1989); *Bickerstaff v. Vassar College*, 196 F.3d 435 (2d Cir.1999); *Hollander v. American Cyanamid Co.*, 172 F.3d 192 (2d Cir.1999), cert. denied 528 U.S. 965, 120 S.Ct. 399, 145 L.Ed.2d 311 (1999); *Raskin v. Wyatt Co.*, 125 F.3d 55 (2d Cir.1997).

32. *See, e.g., Int'l Bhd. of Teamsters v. United States*, 431 U.S. at 335 n. 15 (in disparate treatment case, "proof of discriminatory motive is crucial")

33. *Teamsters*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) ("Proof of discriminatory motive, we have held, is not required under a disparate impact theory") (citing *Griggs v. Duke Power*, 401 U.S. 424, 430–32, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). *See also, Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 987, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) (under disparate impact theory, "the plaintiff is exempted from the need to prove intentional discrimination").

is as clear as it is in this case. For that reason, there is no requirement that plaintiffs control for variables other than race and ethnicity in their statistical proof. The original disparate impact case, *Griggs v. Duke Power*, 401 U.S. 424, 430–32, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), makes clear why this is so. In *Griggs*, the Court held that a requirement that employees either have a high school diploma or pass a general aptitude test was a violation of Title VII since it operated to disqualify many more blacks than whites. Plaintiffs in that case were not required to rule out other variables, such as socio-economic status, or previous educational experience. Indeed, the reason they were not required to so-prove is precisely the reason disparate impact theory was developed—the practices challenged under the theory affect minorities not because of their overtly discriminatory character but rather because the criteria they require correlate closely with race. So, as an example, the high school diploma requirement in *Griggs* hurt blacks in North Carolina because blacks were less likely than whites to have completed high school. If the plaintiffs had been required to show that it was their race that kept them from being hired—not their inability to finish high school—they would have been without legal recourse.

In *Association of Mexican American Educators v. State of California*, 937 F.Supp. 1397, 1410 (N.D.Cal.1996) ("*AMAE*"), the district court rejected the testimony of the same expert SED offers here, Dr. Joan Haworth, holding that her analysis of other factors in explaining the disparate impact was not relevant to the plaintiffs' claim:

> The Court finds [Haworth's] analysis interesting, and ultimately encouraging, because it appears to show that preparation factors play a strong role in a candidate's performance on the CBEST [the California test], regardless of the candidate's race or ethnicity. Nevertheless, this analysis *is entirely irrelevant to the issue of adverse impact.* It does not matter why the disparate impact exists. Defendants cannot escape liability by showing that the disparate impact is attributable to particular background factors.

937 F.Supp. 1397, 1410 (N.D.Cal.1996) (emphasis added). Quoting *Bouman v. Block*, 940 F.2d 1211, 1228 (9th Cir.), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991), the *AMAE District* court continued:

> [T]he whole point of a disparate impact challenge is that a facially non-discriminatory employment or promotion device—in this case, an examination—has a discriminatory *effect.* It would be odd indeed if a defendant whose facially non-discriminatory examination which has a disparate impact could escape the obligation to validate the examination merely by pointing to some *other* facially non-discriminatory factor that correlates with the disparate impact. [The defendant's] failure to validate cannot be excused simply by the correlation between success on the examination and experience.

*AMAE District*, 937 F.Supp. at 1410 (emphasis in original). This reasoning applies to the instant case. Defendant SED's' attack on plaintiffs' prima facie case on the grounds that their expert did not consider enough variables fails.

## B. Appropriate Population

 Defendant SED offers a second reason why DiPrete's report should be disregarded—he did not compare the pass rates of comparable groups: "The mere recitation of how many minority candidates versus white candidates pass or fail is meaningless unless the Court is assured that those groups were comparably quali-

fied." SED Mem. in Opp'n at 31 (citing *Hazelwood School District v. United States*, 433 U.S. 299, 308–09, n. 13, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)). *Hazelwood* is not controlling, however, since it was a "failure to hire" case, and thus the appropriate comparison was between the racial composition of the school's teaching staff and the racial composition of the qualified public school teachers in the relevant labor pool. *Hazelwood*, 433 U.S. at 308, 97 S.Ct. 2736. The case at bar concerns the effect of the exam requirements on those already hired as teachers, thus the appropriate comparison is between those employees in the protected group and those not in the protected group. *See, e.g., Eatman v. United Parcel Service*, 194 F.Supp.2d 256, 267 (E.D.N.Y.2002) ("Where . . . a plaintiff alleges that a policy disparately impacts existing employees, the relevant population for statistical analysis consists of those employees potentially subject to the policy" (citing *Smith*, 196 F.3d at 368) ("The questions to be answered are thus what is the composition of the population subject to the reduction-in-force, what was the retention rate of the protected group compared to the retention rate of other employees, and how much of a differential in selection rates will be considered to constitute a disparate impact" (citation omitted))). In other words, the court rejects SED's contention that plaintiffs' experts studied the wrong population. Like the first, this attack fails as well.

### C. Pass Rates Overall, Not Merely First Time Test–Takers

Defendant SED's final swipe at plaintiffs' prima facie case connects, at least under the standards for summary judgment. The Department notes, accurately, that DiPrete only analyzed the pass rates for first time test takers. *See* DiPrete Report at 8, 11. Further, SED argues that the issue in this case is whether plaintiffs were able to pass the tests over the course of the five years they were allowed under their provisional licenses. In other words, the first time pass rate is not important; rather, the over all pass rate is what really counts. And SED has presented at least some evidence that the pass rates between whites and minority test-takers over the course of five years is not necessarily indicative of a disparate impact. *See* Haworth Decl. Table A; Haworth Report at 17.

Plaintiffs respond with two arguments. The first is that the overall pass rate is not important since each failure on the test deprives the test-taker of an employment opportunity. *See AMAE District*, 937 F.Supp. at 1409. While it is true that plaintiffs were not allowed to apply for full City licenses until they passed the tests (*see* City Chancellor's Regulation C–265), plaintiffs here also seek relief in the form of back pay based on the demotions they suffered as a function of their inability to pass the tests over the course of five years. While injunctive relief would be available based on the disparate impact shown in relation to first time test-takers, the full measure of back pay sought by plaintiffs requires a showing of disparate impact over the longer period.

Second, plaintiffs allege that defendant's expert, Dr. Joan Haworth's study, which analyzed the results over five years, demonstrates a disparate impact, at least when interpreted by their expert, Dr. DiPrete. Pl.s' Exh. 25 (DiPrete Rebuttal Report) at 2. This sort of battle between the experts is the reason we have trials.

Accordingly, that part of plaintiffs' partial motion for summary judgment seeking a declaration of a prima facie showing of disparate impact is DENIED.

### VIII. BUSINESS NECESSITY OR MISUSE OF THE TESTS

Both plaintiffs and defendant SED have moved for summary judgment

with regard to whether the tests in question were appropriately used to demote the plaintiffs. Plaintiffs argue that while there may be some question of fact regarding whether the tests are valid for the limited purpose of evaluating first time teaching applicants who have just completed college, there is no question that they were misused by the defendants in demoting the plaintiffs (who had already been out of college many years, working as teachers). The Department argues that there is no question that the tests were "manifestly related" to the job of teaching and thus justified as a business necessity under prevailing law. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 997–98, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

The court finds that there remain issues of fact with regard to both of these contentions. Indeed, these issues would appear to lie at the heart of the impending trial. Consequently, the relevant parts of both parties' motions are DENIED.